**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NDR COX INVESTMENTS, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>COX GROUP, LLC, a Delaware limited liability company, 5M VENTURE II, LLC, a Delaware limited liability company, MARK REITER and MARTY REITER, individuals,<br><br>Defendants, | ) | Case No.: |

**COMPLAINT**

Plaintiff NDR Cox Investments, LLC ("NDR Cox" or "Plaintiff"), by its attorneys, and for its Complaint against Defendants Cox Group, LLC ("Cox Group"), 5M Venture II, LLC ("5M") and Mark Reiter and Marty Reiter (collectively, the "Reiters," and, collectively with Cox Group, 5M, and Mark, "Defendants"), states:

**INTRODUCTION**

1. Plaintiff brings this Complaint to address several contractual and tortious harms inflicted on it by Cox Group, its member-manager 5M and the two individuals who are the sole members and managers of 5M and who, therefore, exercise *de facto* control over the management of Cox Group.

2. The limited liability company agreement of Cox Group prohibits the company and its member manager (5M) from making and performing certain itemized major decisions without the express written authorization of Plaintiff. Despite this Defendants have made and

performed several major decisions without Plaintiff's written consent, and at times, over Plaintiff's objections.

3. Defendants have also violated fiduciary duties owed to Plaintiff and/or engaged in gross negligence and willful misconduct in the management of Cox Group, further irreparably harming and damaging Plaintiff.

4. To address this wrongful conduct, Plaintiff now brings this Complaint, seeking damages, declaratory judgment and other relief to remedy Defendants wrongful conduct.

**PARTIES AND RELEVANT PERSONS AND ENTITIES**

5. Cox Group is a limited liability company organized in Delaware.

6. NDR Cox possesses a fifty-fifty percent (55%) membership interest and 5M possesses a forty-five percent (45%) membership interest in Cox Group.

7. The managing member of Cox Group is 5M.

8. NDR Cox is a limited liability company organized in Delaware.

9. Ruben Espinoza ("Espinoza") is the sole member and the manager of NDR Cox.

10. Espinoza is a citizen and resident of Florida.

11. 5M is a private equity division of 5M Group, a commercial real estate development and private equity firm located in Chicago, Illinois.

12. The managers and, upon information and belief, sole members of 5M are Mark Reiter and Marty Reiter.

13. The Reiters are, upon information and belief, citizens and residents of Illinois.

**JURISDICTION AND VENUE**

14. This court has original jurisdiction over this case pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

15. This Court has personal jurisdiction over 5M as a company located and conducting business within the State of Illinois.

16. This Court has personal jurisdiction over Mark Reiter and Marty Reiter as residents of the State of Illinois.

17. Venue is proper in this District under 28 U.S.C. 1391 because 5M maintains its headquarters in this District, Mark Reiter and Marty Reiter reside in this District and a substantial part of the events and omissions giving rise to the causes of action set forth herein occurred within this District.

## FACTUAL BACKGROUND

### *The Cox Enterprise*

18. In 1983, the Cox family founded a business enterprise, based in Campbellsville, Kentucky, manufacturing and selling custom millwork used in the construction industry through 11 distribution centers and a trucking fleet, along with two related businesses.

19. Cox Interior, Inc., a Kentucky corporation, manufactures and distributes milled building products, including moldings, interior and exterior hardwood doors, mantels, stair parts and systems, custom trim and custom millwork used in new construction, repair and remodeling.

20. Cox Dimensions, Inc. ("Cox Dimensions"), a Kentucky corporation, is a wood kiln drying and wholesaling business.

21. Cox Shavings, Inc. ("Cox Shavings"), a Kentucky corporation, sells wood shaving byproducts used for animal bedding.

22. Cox Interior, Cox Dimensions and Cox Shavings (collectively the "Cox Enterprise") operate out of a 937,000 square-foot facility situated upon a 144 acre real estate parcel located in Campbellsville, Kentucky (the "Cox Enterprise Real Estate and Facility").

23. By 2023, the Cox Enterprise, under the leadership of Barry Cox, had grown to over $70 million in revenue and 452 employees based upon its relationships with clients such as Cracker Barrel, Churchill Downs and Maker's Mark Distillery.

*NDR Cox and 5M Purchase the Cox Enterprise*

24. On February 10, 2023, 5M entered into an Asset Purchase Agreement with Cox Interior, Cox Dimensions, Cox Shavings and Cox Investments, Barry Cox, Lanny Cox, Joyce Cox, Kay Legg and Larry Legg, as subsequently amended on July 11, 2023, November 29, 2023 and March 3, 2025 (the "APA").

25. Pursuant to the APA, Cox Companies, LLC ("Cox Companies"), a limited liability company organized in Kentucky of which the Cox Group is the manager and sole member, purchased all outstanding stock in the Cox Enterprise. Also pursuant to the APA, 1751 Old Columbia LLC ("Old Columbia"), a limited liability company organized in Delaware of which Cox Group is the manager and sole member, purchased the Cox Enterprise Real Estate and Facility. In total, Cox Companies and Old Columbia paid an aggregate price of $42,000,000.00 for the assets acquired under the APA, payable in installments.

26. In or around August 2023, after they closed on the APA, the Reiters solicited Espinoza's investment in Cox Companies and 1751 Old Columbia through Cox Group.

27. In September, 2023 Espinoza, through NDR Cox, agreed to invest $3,000,000.00 in the Cox Group.

*The Company Agreement of Cox Group*

28. On December 1, 2023, NDR Cox and 5M entered into the Amended and Restated Liability Company Agreement of Cox Group (the "Company Agreement"), a true and correct copy of which is attached hereto as **Exhibit A**.

29. The Company Agreement was primarily drafted by 5M.

30. The Managing Member of Cox Group is 5M. Company Agreement, § 6.2.

31. The Company Agreement vests exclusive management and control of Cox Group with 5M. Company Agreement, § 6.1.

32. Pursuant to the Company Agreement, NDR Cox holds 5,500,000 and 5M holds 4,500,000 of the 10,000,000 Class A Units of membership ("Voting Units") of Cox Group. Company Agreement, § 3.1 and Ex. A.

33. Pursuant to the Company Agreement, 5M may only receive compensation for the performance of its duties as the Managing Member as determined by the vote of at least seventy-five percent (75%) of the Voting Units. Company Agreement, § 6.5(a).

34. Pursuant to the Company Agreement, 5M shall not cause, permit or agree to perform certain major actions (the "Major Decisions") without the affirmative written consent of NDR Cox, including:

a. enter into, modify, terminate, waive (including any failure to enforce rights of Cox Group or any of its subsidiaries), or amend any material transaction, agreement, or arrangement (including, without limitation, any purchase sale, lease, or exchange of any property or rendering of any service, or the establishment of any salary, other compensation, or other employment arrangement) between Cox Group or any of its subsidiaries, on the one hand, and any Member or one of its insiders, on the other hand ( a "Related Party Transaction") (Company Agreement, § 6.3(a));

b. make any material changes to the business relationships, or otherwise amend, modify, terminate or waive any material provision of any agreement or arrangement with its counterparties (Company Agreement, § 6.3(j));

c. approve an annual budget of Cox Group and its subsidiaries or modify or amend any approved budget; provided, however, that in the event that any annual budget is not approved by NDR, Cox Group's annual budget for the most recent Fiscal Year shall remain in effect subject to a 5% increase (or greater increase proportionate to the Company's and its subsidiaries' respective prior Fiscal Year revenue growth) in operating expenditures and capital expenditures (Company Agreement, § 6.3(k));

d. enter into, terminate ( other than for cause or as permitted by the applicable contract or applicable law), or amend in any respect, any employment contract or other employment arrangement, or promise, grant or agree to increase the compensation or benefits of any (x) officer or (y) employee or consultant earning compensation paid by Cox Group or one of its subsidiaries, including in respect of base salaries, hourly wages, bonuses (whether pursuant to bonus agreements or discretionary), commissions, profit-sharing arrangements and other incentive compensation arrangements (excluding distributions to the Members) ("Covered Compensation") in an amount greater than or equal to $100,000 per annum, or (B) promise, grant or agree to increase the Covered Compensation paid to any officer, employee, or consultant, in any year if the aggregate amount of Covered Compensation (including the proposed promise, grant or increase) for all officers, employees and consultants of the Company or any of its subsidiaries is in excess of 9% of the gross revenue of the Company and its subsidiaries on a consolidated basis in the immediately preceding twelve (12) month period (Company Agreement, § 6.3(l)); and

e. make any material change to the nature of the business conducted by Cox Group or any of its subsidiaries (Company Agreement, § 6.3(p)).

35. The Company Agreement provides that members, the managing member and members of the managing member shall only have liability to each other for “acts or omissions that constitute fraud, gross negligence, willful misconduct or a knowing violation of law.” (Company Agreement, §6.8(b)).

*The Old National Bank Loan Covenants*

36. Further, Espinoza agreed to guarantee payment of three revolving credit facilities obtained by Cox Companies and Old Columbia from Old National Bank in the aggregate amount of $35,000,000.

37. As of May, 2025 the aggregate balance of the two revolving credit facilities obtained by Cox Companies and Old Columbia was $32,269,740.

38. On or about December 6, 2023, Cox Group, Cox Companies, Old Columbia, Espinoza, and the Reiters entered into a Business Loan Agreement (the “Loan Agreement”) with Old National Bank.

39. Pursuant to the Loan Agreement, Cox Group is required to maintain a Rolling Cash Flow Coverage Ration of at least 1.0 at all times. Loan Agreement, § 5.01(l)(ii).

40. Pursuant to the Loan Agreement, the Reiters covenanted that they would not permit or cause Cox Group to "make any payments of any kinds to its members or managers (including, without limitation debt repayments, payments for goods or services or others, but excluding salary payments to members or managers employed by such Borrower)". Loan Agreement, § 6.14.

*5M and the Reiters Cause Cox Group to Make Unauthorized Distributions to 5M*

41. Starting in January and continuing through March of 2024, Espinoza and the Reiters met on a weekly basis to discuss and make joint decisions regarding the business of Cox Group and its subsidiaries.

42. On or around March 21, 2024, 5M presented NDR Cox with its proposed 2024 budget (the "Proposed 2024 Budget") for Cox Group.

43. The Proposed 2024 Budget included $40,000 per month in "Management Fees" to be paid to 5M.

44. 5M had never sought and NDR Cox had never approved the payment of any Management Fees to 5M by Cox Group.

45. NDR Cox has never otherwise approved the payments of any amounts to 5M by Cox Group.

46. Due to the proposed Management Fees to be paid to 5M, NDR Cox refused to approve the Proposed 2024 Budget.

47. Despite NDR Cox's refusal to approve the Proposed 2024 Budget, 5M submitted it to Old National Bank as Cox Group's 2024 budget.

48. Following the presentation to NDR Cox of the Proposed 2024 Budget, NDR Cox discovered that 5M and the Reiters had previously caused Cox Group to pay 5M a series of payments which NDR Cox never authorized.

49. When NDR Cox and Espinoza confronted the Reiters and 5M regarding the unauthorized payments they had caused Cox Group to make to 5M, the Reiters and 5M ceased to communicate with NDR Cox or Espinoza or involve NDR Cox or Espinoza in decision-making regarding the business of Cox Group and its subsidiaries.

50. From January of 2024 through July of 2025, the Reiters and 5M caused Cox Group to make payments to 5M exceeding $1 million, all made without the consent or authorization of NDR Cox.

51. Upon information and belief, on and after August of 2025, the Reiters and 5M caused Cox Group to make additional payments to 5M, again without the consent or authorization of NDR Cox. At this time, NDR Cox does not know the amount of these payments.

52. Each of Cox Group's payments to 5M were a violation of Section 6.3 of the Company Agreement.

53. Further, each of Cox Group's payments to 5M violated Section 6.14 of the Loan Agreement.

54. The Reiters and 5M have also caused Cox Group to pay for the Reiters' personal expenses, including through their use of Cox Group's credit card.

55. As one example, the Reiters and 5M caused Cox Group to pay for a membership for Mark Reiter at SOHO House Chicago, a social club.

*5M and the Reiters Cause Cox Group to Enter Into a Self-Dealing Contract, Make Unauthorized Payments and Make Material Changes to Cox Group's Business*

56. In addition, 5M and the Reiters caused Cox Group to enter into a contract with a company owned by Mark Reiter's father-in-law, an Illinois business, to re-gravel the parking lot of the Cox Enterprise Real Estate and Facility in Kentucky in June of 2024. 5M and the Reiters did this after the father-in-law lost a lucrative contract with the City of Chicago, Illinois.

57. Mark Reiter's father-in-law did not possess the requisite experience or qualifications to re-gravel the parking lot of the Cox Enterprise Real Estate and Facility in Campbellsville, Kentucky located over 350 miles from Chicago.

58. Upon information and belief, 5M and the Reiters did not obtain any other bids before causing Cox Group to hire Mark Reiter's father-in-law.

59. Upon information and belief, local contractors in Kentucky would have charged Cox Group approximately $100,000 for the re-graveling project.

60. The Reiters and 5M paid Mark Reiter's father-in-law approximately $500,000 for the re-graveling project.

61. The Reiters and 5M also caused Cox Group to make payments to Michael Miazga in excess of $300,000 from January through June, 2025 for consulting work.

62. At no time did the Reiters or 5M seek or obtain NDR Cox's consent or approval to enter into a consulting contract with Michael Miazga or to grant compensation to Michael Miazga.

63. Further, the Reiters and Cox Group have made material changes to the nature of the business of Cox Group and its subsidiaries without first obtaining the affirmative written consent of NDR Cox, including but not limited to by:

a. terminating or substantially limiting the business of Cox Shavings;

b. eliminating the payment of commissions for the sale of shiplap;

c. decommissioning a sawmill in the spring of 2024; and

d. the creation of a new business line selling excess wood-kiln drying capacity to third parties.

*The Reiters and 5M Terminate or Modify Employee Agreements Without NDR Cox's Consent*

64. In or around the summer of 2025, the Reiters and 5M caused Cox Group, or its subsidiary, to terminate the employment of Barry Cox.

65. The Cox Group's termination of the employment of Barry Cox was not for cause.

66. At the time of the termination of his employment, Barry Cox was earning compensation in an amount greater than or equal to $100,000 per annum.

67. The Reiters and 5M failed to obtain the affirmative written consent of NDR Cox before terminating the employment of Barry Cox.

68. In or around the summer of 2025, the Reiters and 5M caused Cox Group, or its subsidiary, to amend its employment arrangement with Lucy Cox by reducing her compensation from $150,000 to $75,000 per year.

69. The Reiters and 5M failed to obtain the affirmative written consent of NDR Cox before amending the employment arrangement of Lucy Cox.

70. In or around the summer of 2025, the Reiters and 5M caused Cox Group, or its subsidiary, to amend its employment arrangement with Lilian Smith by reducing her compensation from $100,000 to $75,000 per year.

71. The Reiters and 5M failed to obtain the affirmative written consent of NDR Cox before amending the employment arrangement of Lilian Smith.

72. On information and belief, Reiters and 5M took each of these unauthorized employment actions to prevent the impacted employees from seeking to contest or otherwise

question the Reiters' and 5M's management of the Cox Group, especially actions taken by the Reiters and 5M that might prevent investors in the Cox Group from receiving the fruits of their investments as a result of acts or omissions constituting fraud, gross negligence, willful misconduct or a knowing violation of law.

73. The Reiters and 5M are required to refrain from arbitrary or unreasonable conduct which has the effect of preventing NDR Cox from receiving the fruits of its investment in Cox Companies.

74. The acts and/or omissions of the Reiters and 5M constitute a bad faith violation of the implied contractual covenant of good faith and fair dealing.

75. The acts and/or omissions of the Reiters and 5M constitute fraud, gross negligence, willful misconduct or a knowing violation of law.

**COUNT I**
**DECLARATORY JUDGMENT**
**(AGAINST ALL DEFENDANTS)**

76. NDR Cox incorporates paragraphs 1 through 75 as if fully set forth here.

77. An actual and justiciable controversy has arisen and now exists between NDR Cox, on the one hand, and5M, and the Reiters on the other hand, regarding management of Cox Group.

78. The Company Agreement prohibits 5M and the Reiters from causing, permitting or agreeing to perform certain "Major Decisions," as itemized in the Company Agreement, without the affirmative written consent of NDR. (Company Agreement, §6.3).

79. As explained herein, 5M and the Reiters have made and performed or caused Cox Group to make and perform several "Major Decision" without the affirmative written consent of NDR Cox.

80. As a result of the foregoing, a declaration is necessary and appropriate because a substantial controversy exists between the parties having adverse legal interests as to their respective rights as set forth in the Company Agreement. The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

81. Declaratory judgment in this action would serve a useful purpose in clarifying and settling the respective rights and obligations of the parties and would finalize the controversy by according NDR Cox relief from uncertainty and insecurity with respect to the contractually proper management of Cox Group and its subsidiaries.

WHEREFORE, Plaintiff NDR Cox requests enter a declaratory judgment as follows

(1) Adjudging and declaring that defendants cannot, without the affirmative prior written consent of NDR Cox:

a. enter into, modify, terminate, waive (including any failure to enforce rights of Cox Group or any of its subsidiaries), or amend any material transaction, agreement, or arrangement (including, without limitation, any purchase sale, lease, or exchange of any property or rendering of any service, or the establishment of any salary, other compensation, or other employment arrangement) between Cox Group or any of its subsidiaries, on the one hand, and any Member or one of its insiders, on the other hand ( a "Related Party Transaction") (Company Agreement, § 6.3(a));

b. make any material changes to the business relationships, or otherwise amend, modify, terminate or waive any material provision of any agreement or arrangement with its counterparties (Company Agreement, § 6.3(j));

c. approve an annual budget of Cox Group and its subsidiaries or modify or amend any approved budget; provided, however, that in the event that any annual budget is not approved by NDR, Cox Group's annual budget for the most recent Fiscal Year shall remain in effect subject to a 5% increase (or greater increase proportionate to the Company's and its subsidiaries' respective prior Fiscal Year revenue growth) in operating expenditures and capital expenditures (Company Agreement, § 6.3(k));

d. enter into, terminate ( other than for cause or as permitted by the applicable contract or applicable law), or amend in any respect, any employment contract

or other employment arrangement, or promise, grant or agree to increase the compensation or benefits of any (x) officer or (y) employee or consultant earning compensation paid by Cox Group or one of its subsidiaries, including in respect of base salaries, hourly wages, bonuses (whether pursuant to bonus agreements or discretionary), commissions, profit-sharing arrangements and other incentive compensation arrangements (excluding distributions to the Members) ("Covered Compensation") in an amount greater than or equal to $100,000 per annum, or (B) promise, grant or agree to increase the Covered Compensation paid to any officer, employee, or consultant, in any year if the aggregate amount of Covered Compensation (including the proposed promise, grant or increase) for all officers, employees and consultants of the Company or any of its subsidiaries is in excess of 9% of the gross revenue of the Company and its subsidiaries on a consolidated basis in the immediately preceding twelve (12) month period (Company Agreement, § 6.3(l)); and

e. make any material change to the nature of the business conducted by Cox Group or any of its subsidiaries (Company Agreement, § 6.3(p)).

f. pay or agree to pay 5M compensation for the performance of its duties as the Managing Member without the vote of at least seventy-five percent (75%) of the Voting Units. Company Agreement, § 6.5(a).

(2) Awarding NDR its costs and reasonable attorneys' fees;

(3) Granting preliminary and permanent injunctive relief, including the appointment of a receiver; and

(4) Awarding such other further relief as this Court deems just and proper.

## COUNT II
## BREACH OF CONTRACT – COMPANY AGREEMENT
## (AGAINST ALL DEFENDANTS)

82. NDR Cox incorporates paragraphs 1 through 75 as if fully set forth herein.

83. The Company Agreement constitutes a valid and enforceable contract.

84. At all times NDR Cox has fully performed all of its obligations under the Company Agreement.

85. Cox Group and 5M have materially breached the Company Agreement by their conduct described above.

86. Cox Group and 5M have breached the implied covenant of good faith and fair dealing by their conduct.

87. Cox Group's and 5M's willful misconduct as described herein has been undertaken with willful disregard of NDR Cox's rights and/or was grossly negligent.

88. As managers of 5M and de facto in control of Cox Group, Mark and Marty Reiter are bound by the terms of the Company Agreement and they have knowingly caused 5M and the Cox Group to violate their obligations under the Company Agreement.

89. The Reiters and 5M's misconduct as described herein constitutes fraud, gross negligence, willful misconduct and/or a knowing violations of law.

90. As the direct and proximate result of the defendants' material breaches of the Company Agreement, NDR Cox has suffered and will continue to suffer damages in excess of $75,000, the amount to be determined at trial.

91. As the direct and proximate result of the defendants' material breaches of the Company Agreement, NDR Cox has suffered and will continue to suffer irreparable harm.

WHEREFORE, Plaintiff NDR Cox respectfully requests that the Court enter judgment in its favor and against all defendants as follows:

(1) Ordering defendants to specifically perform their obligations under the Company Agreement;

(2) Awarding compensatory damages in an amount to be determined at trial;

(3) Awarding pre-judgment interest;

(4) Awarding all allowable fees and costs of this suit;

(5) Granting preliminary and permanent injunctive relief, including the appointment of a receiver; and

(7) For such further relief as the Court deems appropriate.

**COUNT III**
**BREACH OF FIDUCIARY DUTIES**
**(AGAINST 5M, MARK REITER AND MARTY REITER)**

92. NDR Cox incorporates paragraphs 1 through 75 as if fully set forth herein.

93. As member manager of Cox Group and members of the member manager, 5M and the Reiters owe Cox Group and NDR Cox a duty to conduct themselves in a manner that does not constitute fraud, gross negligence, willful misconduct or a knowing violation of law. (Company Agreement, §6.8(b)).

94. Accordingly, as member manager of Cox Group and members of the member manager, 5M and the Reiters owe Cox Group and NDR Cox a duty of care, a duty of loyalty and a duty to act in good faith to pursue the best interests of the company and its members.

95. 5M and the Reiters violated these duties by engaging in numerous acts and/or omissions constituting gross negligence and willful misconduct.

96. 5M and the Reiters engaged in reckless indifference and gross abuses of discretion amounting to gross negligence by:

(i) causing Cox Group to pay 5M and the Reiters well over $1 million in Management Fees, distributions and various other payments without NDR Cox's express authorization;

(ii) deceptively submitting to Old National Bank an unauthorized purported 2024 budget that was explicitly rejected by NDR Cox;

(iii) refusing to communicate with NDR Cox and Espinoza or involving them in decision-making regarding the business of Cox Group and its subsidiaries;

(iv) causing Cox Group to pay for the Reiter's personal expenses;

(v) causing Cox Group to enter into a non-bid contract for re-gravelling a parking lot with a company owned by a Reiter family member who had neither the requisite

experience nor qualifications and by overpaying $500,000 for the project, four times what other gravel laying companies would have charged; and

(vi) unilaterally and materially changing the nature of the business of Cox Group and its subsidiaries without authorization from NDR Cox.

97. 5M's and the Reiters' acts and omissions set forth in the foregoing paragraph also constitute willful misconduct, self-dealing and breaches of disloyalty to NDR Cox.

98. Such conduct also violates 5M's and the Reiters' duty to act in good faith in pursuing the best interest of NDR Cox as a member of the Cox Group.

99. As the direct and proximate result of the 5M's and the Reiters' breaches of their duties of care, duty of loyalty and duty to act in good faith, NDR Cox has suffered and will continue to suffer damages in excess of $75,000, the amount to be determined at trial.

100. As the direct and proximate result of the defendants' material breaches of the Company Agreement, NDR Cox has suffered and will continue to suffer irreparable harm.

WHEREFORE, Plaintiff NDR Cox respectfully requests that the Court enter judgment in its favor and against all defendants as follows:

(1) Ordering defendants to fully and completely comply with their fiduciary duties to Cox Group and NDR Cox;

(2) Awarding compensatory damages in an amount to be determined at trial;

(3) Ordering the restitution of all monies paid by Cox Group or any of its affiliates to 5M, Mark Reiter and Marty Reiter;

(4) Awarding pre-judgment interest;

(5) Awarding punitive damages to NDR Cox;

(6) Awarding all allowable fees and costs of this suit;

(7) Granting preliminary and permanent injunctive relief, including the appointment of a receiver; and

(8) For such further relief as the Court deems appropriate.

**COUNT IV**
**GROSS NEGLIGENCE – IN THE ALTERNATIVE TO COUNT III**
**(AGAINST 5M, MARK REITER AND MARTY REITER)**

101. NDR Cox incorporates paragraphs 1 through 75 as if fully set forth herein.

102. As member manager of Cox Group and members of the member manager, 5M and the Reiters owe Cox Group and NDR Cox a duty to conduct themselves in a manner that does not constitute gross negligence. (Company Agreement, §6.8(b)).

103. 5M and the Reiters violated this duty by engaging in numerous acts and/or omissions constituting gross negligence.

104. 5M and the Reiters engaged in reckless indifference and gross abuses of discretion amounting to gross negligence by:

(i) causing Cox Group to pay 5M and the Reiters well over $1 million in Management Fees, distributions and various other payments without NDR Cox's express authorization;

(ii) deceptively submitting to Old National Bank an unauthorized purported 2024 budget that was explicitly rejected by NDR Cox;

(iii) refusing to communicate with NDR Cox and Espinoza or involving them in decision-making regarding the business of Cox Group and its subsidiaries;

(iv) causing Cox Group to pay for the Reiter's personal expenses;

(v) causing Cox Group to enter into a non-bid contract for re-gravelling a parking lot with a company owned by a Reiter family member who had neither the requisite experience nor qualifications and by overpaying $500,000 for the project, four times what other gravel laying companies would have charged; and

(vi) unilaterally and materially changing the nature of the business of Cox Group and its subsidiaries without authorization from NDR Cox .

105. As the direct and proximate result of 5M's and the Reiters' gross negligence, NDR Cox has suffered and will continue to suffer damages in excess of $75,000, the amount to be determined at trial.

106. As the direct and proximate result of 5M's and the Reiters' gross negligence, NDR Cox has suffered and will continue to suffer irreparable harm.

WHEREFORE, Plaintiff NDR Cox respectfully requests that the Court enter judgment in its favor and against all defendants as follows:

(1) Ordering defendants to cease all acts and omissions constituting gross negligence in the conduct of managing Cox Group;

(2) Awarding compensatory damages in an amount to be determined at trial;

(3) Ordering the restitution of all monies paid by Cox Group or any of its affiliates to 5M, Mark Reiter and Marty Reiter;

(4) Awarding pre-judgment interest;

(5) Awarding punitive damages to NDR Cox;

(6) Awarding all allowable fees and costs of this suit;

(7) Granting preliminary and permanent injunctive relief, including the appointment of a receiver; and

(8) For such further relief as the Court deems appropriate.

**COUNT V**
**WILLFUL MISCONDUCT– IN THE ALTERNATIVE TO COUNT III**
**(AGAINST 5M, MARK REITER AND MARTY REITER)**

107. NDR Cox incorporates paragraphs 1 through 75 as if fully set forth herein.

108. As member manager of Cox Group and members of the member manager, 5M and the Reiters owe Cox Group and NDR Cox a duty to conduct themselves in a manner that does not constitute willful misconduct. (Company Agreement, §6.8(b)).

109. 5M and the Reiters violated this duty by engaging in numerous acts and/or omissions constituting willful misconduct, including but not limited to the following:

(i) causing Cox Group to pay 5M and the Reiters well over $1 million in Management Fees, distributions and various other payments without NDR Cox's express authorization;

(ii) deceptively submitting to Old National Bank an unauthorized purported 2024 budget that was explicitly rejected by NDR Cox;

(iii) refusing to communicate with NDR Cox and Espinoza or involving them in decision-making regarding the business of Cox Group and its subsidiaries;

(iv) causing Cox Group to pay for the Reiter's personal expenses;

(v) causing Cox Group to enter into a non-bid contract for re-gravelling a parking lot with a company owned by a Reiter family member who had neither the requisite experience nor qualifications and by overpaying $500,000 for the project, four times what other gravel laying companies would have charged; and

(vi) unilaterally and materially changing the nature of the business of Cox Group and its subsidiaries without authorization from NDR Cox.

110. As the direct and proximate result of 5M's and the Reiters' willful misconduct, NDR Cox has suffered and will continue to suffer damages in excess of $75,000, the amount to be determined at trial.

111. As the direct and proximate result of 5M's and the Reiters' willful misconduct, NDR Cox has suffered and will continue to suffer irreparable harm.

WHEREFORE, Plaintiff NDR Cox respectfully requests that the Court enter judgment in its favor and against all defendants as follows:

(1) Ordering defendants to cease all acts and omissions constituting willful misconduct in the conduct of managing Cox Group;

(2) Awarding compensatory damages in an amount to be determined at trial;

(3) Ordering the restitution of all monies paid by Cox Group or any of its affiliates to 5M, Mark Reiter and Marty Reiter;

(4) Awarding pre-judgment interest;

(5) Awarding punitive damages to NDR Cox;

(6) Awarding all allowable fees and costs of this suit;

(7) Granting preliminary and permanent injunctive relief, including the appointment of a receiver; and

(8) For such further relief as the Court deems appropriate.

**Jury Demand**

Plaintiff demands a trial by jury on all issues triable to a jury.

Dated: September 16, 2025

/s/ Michael B. Cohen

Michael B. Cohen (mcohen@em3law.com)
Max A. Stein (mstein@em3law.com)
Keith M. Stolte (kstolte@em3law.com)
Maxson Mago & Macaulay LLP
77 West Wacker Drive, Suite 4500
Chicago, Illinois 60601
(312) 803-0378

*Counsel for Plaintiff NDR Cox Investments, LLC*

# Exhibit A

# COX GROUP, LLC
# AMENDED AND RESTATED
# LIMITED LIABILITY COMPANY AGREEMENT

Dated as of December 1, 2023

THE UNITS REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH UNITS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR AN EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

CERTAIN OF THE UNITS REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS SET FORTH IN RESTRICTED UNIT AWARD AGREEMENTS BETWEEN THE COMPANY AND CERTAIN GRANTEES OF UNITS.

**TABLE OF CONTENTS**

ARTICLE 1 FORMATION ....................4
1.1 Formation ....................4
1.2 Name ....................4
1.3 Principal Place of Business ....................4
1.4 Purpose ....................4
1.5 Qualification and Registration ....................4
1.6 Registered Office / Registered Agent ....................4
1.7 Term ....................5
1.8 Title to Property ....................5
1.9 Entity Classification ....................5

ARTICLE 2 DEFINITIONS ....................5

ARTICLE 3 CAPITALIZATION OF THE COMPANY ....................9
3.1 Units ....................9
3.2 Additional Capital Contributions ....................10
3.3 Capital Accounts ....................11
3.4 Adjustments to Company Assets ....................12
3.5 Interest ....................12
3.6 Conversion ....................12

ARTICLE 4 DISTRIBUTIONS ....................12
4.1 Distributions Generally ....................12
4.2 Priority of Distributions ....................12
4.3 Limitation Upon Distributions ....................12
4.4 Tax Distributions ....................12
4.5 Required Withholding ....................13

ARTICLE 5 ALLOCATIONS ....................13
5.1 Allocations of Profits and Losses ....................13
5.2 Regulatory Allocations ....................14
5.3 Tax Allocations ....................14
5.4 Excess Nonrecourse Liabilities ....................15

ARTICLE 6 MANAGEMENT ....................15
6.1 Management Generally ....................15
6.2 Managing Member ....................15

6.3 Major Decisions ....16
6.4 Compensation; Use of Agents; Officers ....17
6.5 Members' Consent ....18
6.6 Accounting and Financial Information; Records ....18
6.7 Duties; Indemnity ....18
6.8 New Members ....19
6.9 Rights and Obligations of Members ....20
6.10 Company Representative ....21

ARTICLE 7 TRANSFER OF INTERESTS; PREEMPTIVE RIGHTS ....23
7.1 No Transfers ....23
7.2 Securities Law Transfer Restrictions ....23
7.3 Effect of Transfer; Transferees Bound ....24
7.4 Tag Along and Bring Along Rights ....24
7.5 Preemptive Rights ....26

ARTICLE 8 TERMINATION AND DISSOLUTION ....26
8.1 Dissolution ....26
8.2 Dissolution Procedure ....27
8.3 Return of Contributions ....28

ARTICLE 9 GENERAL PROVISIONS ....28
9.1 No Third Party Rights ....28
9.2 Notifications ....28
9.3 Integration ....28
9.4 Applicable Law ....28
9.5 Counterparts ....29
9.6 Severability ....29
9.7 Inurement ....29
9.8 Headings ....29
9.9 Gender ....29
9.10 Exhibits ....29
9.11 Waiver of Partition ....29
9.12 Company Counsel ....29

ARTICLE 10 AMENDMENTS ....30

Exhibits

Exhibit A - Members and Units
Exhibit B - Officers
Exhibit C - Joinder

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

This Amended and Restated Limited Liability Company Agreement (including all exhibits hereto, as it may be amended, supplemented or restated from time to time "***Agreement***") of Cox Group, LLC, a Delaware limited liability company (the "***Company***"), is made and effective as of December 1, 2023 (the "***Effective Date***"), by and among the Persons admitted as Members set forth on the signature pages hereto, together with such Persons that are later admitted as members pursuant to the terms of this Agreement (individually, a "***Member***" and, collectively, the "***Members***").

WHEREAS, the Company has been formed by the Class A Members under the Delaware Uniform Limited Liability Company Act (the "***Act***").

NOW, THEREFORE, the Members adopt this Agreement for the Company.

## ARTICLE 1

## FORMATION

**1.1 Formation**. The Company has been formed as a Delaware limited liability company pursuant to the Act by filing Articles of Organization with the Delaware Secretary of State on June 8, 2023 in accordance with the Act, and the rights and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement. The Company shall execute such further documents and take such further actions as shall be appropriate to comply with the requirements of the Act for the operation of a limited liability company.

**1.2 Name**. The name of the Company shall be Cox Group, LLC, or such other name as from time to time may be determined by the Managing Member.

**1.3 Principal Place of Business**. The principal place of business of the Company shall be located at such place or places as from time to time may be determined by the Managing Member.

**1.4 Purpose**. The purpose of the Company shall be to own and manage its subsidiaries, namely Cox Companies, LLC and 1751 Old Columbia LLC, and related activities (the "***Company Business***") and perform any and all acts permitted to be performed by a Delaware limited liability company under Delaware law. The Company has the power to do any and all acts necessary, appropriate, proper, advisable, incidental, or convenient to or in furtherance of the purposes of the Company set forth in this Section 1.4.

**1.5 Qualification and Registration**. The Company shall, as soon as practicable, take any and all actions reasonably necessary to perfect and maintain the status of the Company as a limited liability company under the laws of the State of Delaware. The Company's authorized officers, at the direction of the Managing Member, shall execute and cause to be filed original or amended certificates and shall take any and all other actions as may be reasonably necessary to perfect and maintain the status of the Company as a limited liability company or similar type of entity under the laws of any other jurisdictions in which the Company does business.

**1.6 Registered Office / Registered Agent**. The address of the registered office of the Company in the State of Delaware shall be 850 New Burton Road, Suite 201, Kent County, Dover, Delaware 19904, and the initial registered agent for service of process on the Company in the State of Delaware at such registered office shall be Cogency Global Inc. The registered office and/or registered agent can be changed by the Managing Member. If the Company will change its registered office and/or its registered agent, then the Company's authorized officers, at the direction of the Managing Member, shall

file, or cause to be filed, the necessary amendment with the Delaware Secretary of State in the form required by the Act.

**1.7** **Term**. The term of the Company shall continue until the Company is dissolved in accordance with the provisions of this Agreement.

**1.8** **Title to Property**. All Property owned by the Company shall be owned by the Company as an entity, and no Member shall have any ownership interest in such Property in its individual name, and each Member's interest in the Company shall be personal property for all purposes. At all times after its formation, the Company shall hold title to all of its Property in the name of the Company and not in the name of any Member.

**1.9** **Entity Classification**. The Members agree that the Company shall be classified as a partnership for U.S. federal tax purposes, and the Members and the Company agree that they shall refrain from making any elections under the Regulations, and from filing any returns or reports, that are inconsistent with such classification unless and until the Managing Member consents to a change in the U.S. tax classification of the Company.

## ARTICLE 2

## DEFINITIONS

***"1933 Act"*** has the meaning set forth in Section 7.2 hereof.

***"Acceptance Notice"*** has the meaning set forth in Section 7.4(a)(ii) hereof.

***"Act"*** has the meaning set forth in the recitals of this Agreement.

***"Additional Capital Contribution"*** means, with respect to each Member, any additional Capital Contribution made by such Member pursuant to Section 3.2(b) hereof.

***"Adjusted Capital Account Deficit"*** means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year or other period, after giving effect to the following adjustments:

(a) increasing such Capital Account by any amounts which such Member is obligated to restore pursuant to this Agreement (including any note obligations) or is deemed to be obligated to restore pursuant to the penultimate sentence of each of Regulations Sections 1.704-2(i)(5) and 1.704-2(g); and

(b) decreasing such Capital Account by the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

***"Affiliate"*** means, as to any Member or otherwise, a Person controlling, controlled by or under common control with such Member or other Person. For purposes of this definition, "***control***" means: (i) the ability to vote, directly or indirectly, stock or other equity securities having more than fifty percent (50%) of the voting power of all outstanding stock or other equity securities of an entity, (ii) the ability to

otherwise direct the day to day operations of an entity, or (iii) such equivalent of (i) or (ii) for a not-for-profit company.

***"Assumed Tax Rate"*** applicable to holders of Units means the highest marginal United States federal and state income tax rates applicable to the kinds of taxable income realized by such holders as determined by the Managing Member, taking into account the individual tax rates on any long-term capital gains and any qualified dividend income, and assuming that the applicable state income tax rate is 5% after taking into account any benefit of a deduction for federal income tax purposes.

***"Capital Account"*** means the capital account maintained for each Member in accordance with Section 3.3 hereof.

***"Capital Contribution"*** means, with respect to any Member, the amount of money and the initial Carrying Value of any Property (other than money) contributed to the Company with respect to Units in the Company held or purchased by such Member, including any Additional Capital Contributions.

***"Carrying Value"*** means, with respect to any asset, the asset's adjusted basis for federal income tax purposes except as follows:

(a) The initial Carrying Value of any asset contributed (or deemed contributed) to the Company shall be that asset's Fair Market Value at the time of the contribution.

(b) The Managing Member may elect to revalue the Carrying Value of all Company Property (whether tangible or intangible) for book purposes to reflect the Fair Market Value of Company Property immediately prior to the occurrence of an event set forth in Regulations Section 1.704-1(b)(2)(iv)(f). In the event that Company Property is revalued pursuant to this clause (b), the Capital Accounts of the Members shall be adjusted in accordance with Regulations Section 1.704-1(b)(2)(iv)(f).

(c) If the Managing Member does not elect to revalue Company Property distributed to Members pursuant to clause (b) above, (y) the Carrying Value of that Property shall be revalued for book purposes to reflect the Fair Market Value of that Property immediately prior to its distribution, and (z) the Capital Accounts of all Members shall be adjusted in accordance with Regulations Section 1.704-1(b)(2)(iv)(e).

(d) If the adjusted tax basis of Company assets are adjusted pursuant to Code Sections 732, 734 or 743, the Carrying Value of those Company assets shall be increased or decreased to the extent provided by Regulations Section 1.704-1(b)(2)(iv)(m).

(e) The Carrying Value of a Company asset shall be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes in accordance with Regulations Section 1.704-1(b)(2)(iv)(g).

***"Class A Member"*** means a Member holding Class A Units.

***"Class A Unit"*** means a Unit designated as such upon its issuance and having the rights, preferences, and obligations set forth herein.

***"Code"*** means the Internal Revenue Code of 1986, as amended (or any corresponding provision or provisions of any succeeding law).

***"Company"*** has the meaning set forth in the introductory paragraph of this Agreement.

***"Company Business"*** has the meaning set forth in Section 1.4 hereof.

***"Company Confidential Information"*** has the meaning set forth in Section 6.10(d) hereof.

***"Company Counsel"*** means Akerman LLP.

***"Co-Sale Member"*** has the meaning set forth in Section 7.4(a)(ii) hereof.

***"Co-Sale Notice"*** has the meaning set forth in Section 7.4(a)(i) hereof.

***"Dissolution Event"*** has the meaning set forth in Section 8.1 hereof.

***"Distributable Cash"*** means for a Fiscal Year or other period the excess, if any, of (i) total cash receipts of the Company for such Fiscal Year or other period, as determined by the Managing Member, exclusive of Capital Contributions or loans to the Company unless and to the extent that the Managing Member determines to treat such Capital Contributions or loans as Distributable Cash, and the amount of reduction in cash reserves previously established by the Managing Member, over (ii) the sum of total cash disbursements made by the Company for such Fiscal Year or other period and the amount, if any, of such cash receipts that the Managing Member determines to be reserved for reinvestment in an existing or new portfolio company or for any other needs of the Company's business or activities.

***"Effective Date"*** has the meaning set forth in the introductory paragraph of this Agreement.

***"Fair Market Value"*** means, as to any property, the price at which a willing and able seller would sell, and a willing and able buyer would buy, such property having full knowledge of the facts, and assuming such party acts on an arm's-length basis with the expectation of concluding the purchase and sale within a reasonable time, as reasonably determined by the Managing Member consistent with any relevant third party appraisals with respect thereto.

***"Fiscal Year"*** means (i) the period commencing upon the formation of the Company in 2023 and ending on December 31, 2023, (ii) any subsequent twelve-month period commencing on January 1 and ending on December 31, and (iii) the period commencing on the immediately preceding January 1 and ending on the date on which all Property is distributed to the Members pursuant to Article 8 hereof.

***"Full Sale Notice"*** has the meaning set forth in Section 7.4(b)(i) hereof.

***"Full Sale Transaction"*** has the meaning set forth in Section 7.4(b)(i) hereof.

***"Incentive Unit Agreement"*** means an agreement granting Non-Voting Common Units to a Management Holder.

***"Indemnitee"*** has the meaning set forth in Section 6.8(b) hereof.

***"Liquidator"*** has the meaning set forth in Section 8.2(a) hereof.

***"Management Holder"*** means any employee or consultant of the Company receiving a grant of Non-Voting Common Units.

***"Managing Member"*** has the meaning set forth in Section 6.2 hereof.

***"Member"*** means each Person executing this Agreement as a member or its permitted successor, and any Person subsequently admitted as a Member pursuant to the terms of this Agreement.

***"Member Representatives"*** has the meaning set forth in Section 6.10(d) hereof.

***"Non-Voting Common Unit"*** means a Unit designated as such upon its issuance and having the rights, preferences, and obligations set forth herein.

***"Notice"*** has the meaning set forth in Section 9.2 hereof.

***"Offered Units"*** has the meaning set forth in Section 7.4(a)(i) hereof.

***"Person"*** means an individual or a corporation, partnership (whether general or limited), trust, limited liability company, unincorporated organization, association or other entity or organization.

***"Profits"*** or ***"Losses"*** means for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

(a) income of the Company that is exempt from federal income tax shall be added to taxable income or loss;

(b) expenditures of the Company described in Code Section 705(a)(2)(B) or treated as such expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), shall be subtracted from taxable income or loss;

(c) gain or loss resulting from the disposition of Company asset shall be determined by reference to the Carrying Value of the Company asset;

(d) items of gain, loss, depreciation, amortization or depletion that would be computed for federal income tax purposes by reference to the tax basis of a Company asset shall be determined by reference to the Carrying Value of that asset in accordance with Regulations Section 1.704-1(b)(2)(iv)(g);

(e) if the Carrying Value of any Company asset is adjusted in accordance with any of clauses (b), (c) or (d) of the definition of Carrying Value, the amount of that adjustment shall be taken into account as gain or loss from the disposition of that asset; and

(f) items that are specially allocated pursuant to Sections 5.2(b), (c) or (d) shall not be taken into account in computing Profits or Losses.

***"Profits Interest"*** has the meaning set forth in Section 3.1(d) hereof.

***"Property"*** means all real and personal property acquired by the Company, including cash, and any improvements thereto, and shall include both tangible and intangible property.

***"Proposing Members"*** has the meaning set forth in Section 7.4(b)(i) hereof.

***"Regulations"*** means the income tax regulations promulgated under the Code and in effect, as amended, supplemented or modified from time to time.

***"Revised Partnership Audit Procedures"*** means the provisions of Subchapter C of Subtitle A, Chapter 63 of the Code, as amended by P.L. 114-74, the Bipartisan Budget Act of 2015 (together with any subsequent amendments thereto, Treasury Regulations promulgated thereunder, and published administrative interpretations thereof) or any similar procedures established by a state, local, or non-U.S. taxing authority.

***"Rules"*** have the meaning set forth in Section 9.12 hereof.

***"Selling Members"*** as the meaning set forth in Section 7.4(a)(i) hereof.

***"Tax Distributions"*** shall have the meaning ascribed to such term in Section 4.4 hereof.

***"Transfer"*** means, directly or indirectly, any sale, assignment, transfer, pledge, hypothecation, granting a lien or other security interest, or other disposition of all or part of any Unit, by operation of law or otherwise, voluntarily or involuntarily, by intestacy, will, trust or estate distribution, or *inter vivos* action. "***Transferred***" or "***Transferee***" shall have the correlative meanings.

***"Unit"*** means an interest of a Member in the Company representing a fractional part of the interests of all Members, with each such Unit having such rights and obligations as set forth herein (including the holder's share of the Profits and Losses of the Company and a Member's right to receive distributions of the Company's assets). Each Unit issued hereunder shall be designated as a Class A Unit. A reference to "***Unit***" in this Agreement without further designation as a Class A Unit shall constitute a reference to a Unit of any class (if such reference is in the singular) and to Units of all classes (if such reference is plural).

***"Voting Members"*** means the Class A Members.

***"Voting Units"*** means the Class A Units.

## ARTICLE 3

## CAPITALIZATION OF THE COMPANY

**3.1 Units.**

(a) Interests in the Company shall be represented by Units, consisting of the Class A Units and Non-Voting Common Units, and such additional series or class of Units hereafter approved by the Managing Member.

(b) As of the date hereof, each Class A Member, shall have made, and hereby agrees to make, the Capital Contributions set forth in the books and records of the Managing Member. The names and addresses of each holder of Units and the number and class of Units held by each such holder as of the date hereof are set forth on Exhibit A attached hereto.

(c) Each Class A Member shall have the right to one vote for each Voting Unit held by such Person as to all matters submitted to a vote of the Voting Members.

(d) From time to time after the date hereof the Managing Member, upon the affirmative written consent of NDR Cox Investments LLC, shall have the authority to authorize and reserve, and to cause the Company to issue, additional Units on terms and conditions determined by the Managing Member in its sole discretion. In addition, from time to time after the date hereof the Managing Member shall have the authority to authorize and reserve, and to cause

the Company to issue, subject to Incentive Unit Agreements, Non-Voting Common Units to employees or other service providers of the Company or its subsidiaries in an amount determined by the Managing Member. The Company and each Management Holder hereby acknowledges and agrees that each such Management Holder's Non-Voting Common Units, and the rights and privileges associated with such Non-Voting Common Units, collectively are intended to constitute a "profits interest" in the Company within the meaning of IRS Revenue Procedure 93-27, 1993-2 C.B. 343 ("Rev. Proc. 93-27") or any successor IRS or Treasury Department Regulation or other pronouncement applicable at the date of issuance of the Units to a Management Holder (a "Profits Interest"). The Company shall treat a Member holding a Profits Interest as the owner of such Profits Interest from the date it is granted, and shall file its IRS Form 1065 and issue appropriate Schedule K-1s to such Member, allocating to such Member its distributive share of all items of income, gain, loss, deduction and credit associated with such Profits Interest as if it were fully vested. Each such Member agrees to take into account such distributive share in computing its Federal income tax liability for the entire period during which it holds such Profits Interest. Except as required pursuant to a "Determination" (as defined in Code Section 1313(a)), the Company and each Member agree not to claim a deduction (as wages, compensation or otherwise) for the fair market value of such Profits Interest issued to a Member, either at the time of grant of such Profits Interest or at the time it becomes substantially vested. The undertakings contained in this Section 3.2(b) shall be construed in accordance with Section 4 of Rev. Proc. 2001-43, 2001-2 C.B. 191 ("Rev. Proc. 2001-43"). Each Management Holder shall have the right to make a timely election under Code Section 83(b) with respect to such Non-Voting Common Units upon their issuance, provided that the provisions of this Section 3.1 shall apply regardless of whether or not the holder of a Profits Interest files such an election.

(e) By executing this Agreement, the Members and the Company agree to take such actions as may be required by any authority or guidance that may be issued in the future with respect to the taxation of Profits Interests transferred in connection with the performance of services to conform the tax consequences to the Company and any Member that receives such Profits Interest as closely as possible to the consequences under Rev. Proc. 93-27 and Rev. Proc. 2001-43.

(f) Each Member authorizes the Managing Member to amend this Section 3.1 to the extent necessary to achieve substantially the same tax treatment with respect to any Profits Interest in the Company transferred to a service provider by the Company in connection with services provided to the Company as is set forth in, as applicable, Rev. Proc. 93-27, Rev. Proc. 2001-43 or any future authority described herein, provided that such amendment is not materially economically adverse to any Member.

(g) The Non-Voting Common Units issued to the Management Holders shall be subject to vesting and other conditions as set forth in the applicable Incentive Unit Agreement.

**3.2 Additional Capital Contributions.**

(a) No Member shall be required to make any Additional Capital Contribution in addition to that Member's initial Capital Contribution as reflected in the books and records of the Company.

(b) If at any time the Managing Member determines that the Company requires additional funds in order to fund additional Company expenses, the Managing Member shall notify the Members of such need and deliver written notice thereof to the Members no less than ten (10) Business Days prior to the date on which such capital is required, which notice (each, a "Capital Call Notice") shall set forth (i) in reasonable detail the purpose for which the capital is to be used,

(ii) the date on which the funds are required, and (iii) the amounts to be contributed by each Member, which amounts shall be determined in accordance with each Members' percentage equity ownership in the Company. Within ten (10) Business Days after the date on which the Capital Call Notice is delivered (or such later date as may be specified in the Capital Call Notice), each Member shall contribute to the Company the additional funds requested in the Capital Call Notice. If a Member fails to timely make all or any portion of any Capital Contribution it is required to make to the Company pursuant to this Section 3.2 on the date specified and such failure continues for five (5) Business Days following the date such Capital Contribution is due (such Member, the "Non-Funding Member"), the other Members (provided they have made the corresponding Capital Contribution required of them) shall be deemed the "Funding Member(s)." Upon written notice to the Non-Funding Member, the Funding Member may require the Company to return the capital funded by the Funding Member in response to the applicable Capital Call Notice. Upon written notice to the Non-Funding Member, permit the Company to retain such funds and designate such funds as a loan to the Company (each, a "Capital Call Loan"). If the Funding Member elects to designate such funds as a Capital Call Loan, it also shall have the right, but not the obligation, to fund the remaining unfunded capital (or any portion thereof) and to treat all such funded amounts as an additional Capital Call Loan. Each Capital Call Loan shall bear interest at a floating annual rate equal to the rate of interest announced by the Wall Street Journal or any reasonable successor to it if it ceases to announce the prime rate plus two percent (2%), compounded monthly, with such interest rate to be adjusted on the first day of each calendar quarter. The Funding Member for each Capital Call Loan shall be considered a third-party creditor of the Company to the extent of its Capital Call Loan and the principal and interest on the Capital Call Loan shall be repaid as a Company expense before any distributions to Members pursuant to this Agreement with any such repayment first applied to reduce the interest accrued on such Capital Call Loan and then to reduce the principal amount thereof. If a Capital Call Loan is made by a Funding Member, (I) the Capital Account of such Member shall not be credited with the amount of any Capital Call Loan and (II) the repayment of the Capital Call Loan and repayment or reimbursement of any interest or expenses thereunder shall not constitute a return of Capital Contributions or reduce the Funding Member's Capital Account. If requested by the Funding Member in connection with a Capital Call Loan made by the Funding Member, the Company shall execute and deliver to the Funding Member immediately upon demand a promissory note.

**3.3 <u>Capital Accounts</u>.**

(a) Accounts. A Capital Account shall be maintained for each Member. Each Member's Capital Account shall be credited with (i) such Member's Capital Contributions (net of liabilities that the Company assumes or takes subject to), (ii) such Member's share of Profits and any items in the nature of income or gain that are specifically allocated to such Member, and (iii) the amount of any Company liabilities assumed by such Member, and shall be debited with (x) such Member's share of Losses and any items in the nature of losses or expenses that are specifically allocated to such Member, (y) the amount of money and the Carrying Value of any Property distributed to such Member (net of liabilities that such Member assumes or takes subject to) pursuant to any provision of this Agreement, and (z) the amount of any liabilities of such Member assumed by the Company; <u>provided</u>, <u>however</u>, that each such Member's Capital Account shall be adjusted by such Member's share of income, gain, deduction or loss described in Regulations Section 1.704-1(b)(2)(iv)(g). In determining the amount of any liability for purposes of this <u>Section 3.3</u>, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations. Each Member's Capital Account shall include that of any predecessor of such Member in accordance with Regulations Section 1.704-1(b)(2)(iv)(l).

(b) Modifications. The Managing Member is authorized to modify the manner in which the Members' Capital Accounts are maintained in order to comply with Regulations Section 1.704-1(b) if such modification does not have, and is thereafter not likely to have, a material effect on the amounts distributable to any Member under this Agreement.

**3.4 Adjustments to Company Assets**. In case of a distribution of Property made in the manner provided in Code Section 734, or in the case of a transfer of any Unit in the Company permitted by this Agreement made in the manner provided in Code Section 743, the Company Representative, on behalf of the Company, may, but shall not be required to, file an election under Code Section 754 in accordance with the procedures set forth in the applicable Regulations and may, but shall not be required to, file such an election in a timely manner at the request of any Member affected by the distribution or transfer. The Company shall make such basis adjustments, if any, as may be required under Code Sections 734 and 743 in the absence of a Code Section 754 election.

**3.5 Interest**. No Member shall be entitled to receive interest on its Capital Contributions made pursuant to Section 3.1 hereof, Additional Capital Contribution(s) made pursuant to Section 3.2 hereof or its Capital Account balance.

**3.6 Conversion**. In the event that a majority of the Voting Members determines that it would be in the best interests of the Company to convert to a corporation, each Unit automatically will be converted into such class or classes of equity securities of the successor entity as the Managing Member shall reasonably determine will, as closely as reasonably possible, maintain the relative economic, voting and other rights (taking into account any other investments or transactions that shall occur at the time of such conversion) as shall then exist with respect to Units and the other Units.

## ARTICLE 4

## DISTRIBUTIONS

**4.1 Distributions Generally**. The Company may from time to time, at the direction of the Managing Member with the affirmative written consent of NDR Cox Investments LLC, distribute the Distributable Cash to the holders of Units.

**4.2 Priority of Distributions**. Distributions of Distributable Cash and, subject to Section 8.2(a), distributions made in liquidation of the Company (including for such purpose any sale, merger or consolidation of the Company to a third party) shall be made to the holders of Units, pro rata in proportion to their respective ownership of such Units (treating for these purposes all Units as a single class and, with respect to Non-Voting Common Units, subject to any hurdle amounts stated in the applicable Incentive Unit Agreement).

**4.3 Limitation Upon Distributions**. No distribution shall be made to any Member that would be prohibited by the Act or would result in a breach of or default under any loan agreement to which the Company is a party and, prior to a Dissolution Event, there will be no distribution of assets other than cash or securities to any Member. If a distribution is made to a Member under Section 4.2 hereof that is not entirely cash, each Member will receive the same proportion of cash and each other type of consideration distributed.

**4.4 Tax Distributions**. Notwithstanding Section 4.2, but subject to limitations imposed by law or contracts binding on it, the Company shall distribute to the holders of each class of Units, on an annual basis on or before September 1 of the following year, or such earlier or quarterly date(s) as the Managing Member shall from time to time deem necessary or appropriate, at least the following aggregate

amounts (the "***Tax Distributions***") in proportion to their respective ownership of such Units within such class, an amount of Distributable Cash equal to the product of (A) the Assumed Tax Rate applicable to the Members within such class and (B) the excess, if any, of (1) the amount of taxable income (as computed for federal income tax purposes) allocated to the Members within such class for the current period, over (2) the cumulative excess of taxable loss over taxable income (as computed for federal income tax purposes) allocated to the Members within such class for all prior periods. All Tax Distributions (x) shall be treated as having been distributed pursuant to the applicable subsections of Section 4.2 hereof, (y) shall reduce future amounts otherwise distributable under such subsections and (z) shall not be made if and to the extent that other distributions under Section 4.2 hereof have provided each Member with cash sufficient to enable them to satisfy their tax obligations with respect to taxable income allocable by the Company to such Member.

**4.5 Required Withholding**. The Company is authorized to withhold from distributions to a Member, or with respect to allocations to a Member, and to pay over to a federal, state, local or foreign government, any amounts required to be withheld pursuant to the Code, or any provision of any other federal, state, local or foreign law. All amounts withheld pursuant to this Section 4.5 shall be treated as amounts distributed to the relevant Member or Members for all purposes of this Agreement.

## ARTICLE 5

## ALLOCATIONS

**5.1 Allocations of Profits and Losses.**

(a) Profits for each fiscal year shall be allocated in the following order and priority:

(i) first, to the Members in an amount equal to the excess, if any, of (i) the cumulative Losses allocated pursuant to Section 5.1(b) hereof for all prior fiscal years, over (ii) the cumulative Profits allocated pursuant to this Section 5.1(a) for all prior fiscal years; and

(ii) the balance, if any, to the Members in accordance with each Members' percentage equity ownership in the Company.

(b) Losses for any fiscal year shall be allocated in the following order and priority:

(i) first, to the Members in accordance, in accordance with each Members' percentage equity ownership in the Company, in an amount equal to the excess, if any, of (A) the cumulative Profits allocated pursuant to Section 5.1(a) hereof for all fiscal years, over (B) the cumulative Losses allocated pursuant to this Section 5.1(b) for all prior fiscal years; and

(ii) The balance, if any, to the Members in accordance with each Members' percentage equity ownership in the Company.

(c) The Losses allocated pursuant to this Section 5.1 shall not exceed the maximum amount of losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any fiscal year. In the event some but not all of the Members would have any Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to Section 5.1, the limitation set forth in this Section 5.1 shall be applied on a Member by Member basis so as

to allocate the maximum permissible Losses to each Member under Treas. Reg. Sec. 1.704-1(b)(2)(ii)(d).

**5.2** **Regulatory Allocations**. This Section 5.2 applies certain provisions of the Regulations when a Member has a deficit capital account balance, or would have a deficit capital account balance but for the application of this Section 5.2 or if a change in Unit ownership occurs. Despite any other provision of this Article:

(a) The Agreement shall be deemed to contain (1) a "***minimum gain chargeback***" provision, within the meaning of Regulations Section 1.704-2(f); and (2) a "***partner minimum gain chargeback***" provision within the meaning of Regulations Section 1.704-2(i)(4), and there shall be allocations consistent with such provisions;

(b) If any Member unexpectedly receives an adjustment, allocation or distribution of the type contemplated by Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of income and gain shall be allocated to all such Members (to the extent of and in proportion to the amounts of their respective Adjusted Capital Account Deficits) in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit of such Member as quickly as possible. It is intended that this Section 5.2(b) qualify and be construed as a "***qualified income offset***" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(d);

(c) No loss or deduction shall be allocated to any Member to the extent that such allocation would cause or increase an Adjusted Capital Account Deficit of such Member. Any such loss or deduction shall be reallocated away from such Member and to the other Members in accordance with this Agreement, but only to the extent that such reallocation would not cause or increase an Adjusted Capital Account Deficit with respect to such other Members. To the extent that allocations of loss or deduction have been made pursuant to this Section 5.2(c), future allocations of income and gain, notwithstanding anything to the contrary in this Agreement, shall be made first to restore such allocations of loss or deduction;

(d) Nonrecourse deductions, within the meaning of Regulations Section 1.704-2(b)(1), shall be allocated to the holders of Units in proportion to their ownership of such Units, and any item of Company loss or deduction that is attributable to a "***partner non-recourse debt***" (within the meaning of Regulations Section 1.704-2) shall be allocated to the Members, that bear the economic risk of loss for such debt (within the meaning of Regulations Section 1.752-2); and

(e) If during any taxable year of the Company there is a change in any Member's Units in the Company, allocations of income or loss for such taxable year shall take into account the varying interests of the Members in the Company in a manner selected by the Managing Member which is consistent with the requirements of Code Section 706 and the Regulations thereunder.

**5.3** **Tax Allocations**.

(a) Except as provided in Section 5.3(b) below, items of Company income, gain, loss, deduction and credit shall be allocated, for federal, state and local income tax purposes, among the Members in a manner that equitably reflects the manner in which its corresponding item of "***book***" income, gain, loss or deduction has been allocated under Section 5.1 and Section 5.2 hereof.

(b) Any item of taxable income, gain, loss and deduction with respect to Property of the Company that has a Carrying Value different from its adjusted basis for federal income tax purposes will be shared among the Members so as to take account of such difference in accordance

with the principles of Code Section 704(c) and the Regulations thereunder. The Managing Member may select any reasonable method or methods for making such allocations including, without limitation, any method described in Regulations Sections 1.704-3(b), (c), or (d). In the event the Carrying Value of any Company Property is adjusted pursuant to the definition of Carrying Value, subsequent allocations of income, gain, loss, and deduction with respect to such Property shall take account of any variation between such Property's adjusted basis for federal income tax purposes and such Carrying Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

**5.4** **Excess Nonrecourse Liabilities**. For purposes of Regulations Section 1.752-3(a)(3), the Members agree that "***excess nonrecourse liabilities***" (as defined in Regulations Section 1.752-3(a)(3)) of the Company shall be allocated among the holders of Units in proportion to their ownership of such Units.

## ARTICLE 6

## MANAGEMENT

**6.1** **Management Generally**. The management and control of the Company shall be vested exclusively in the Managing Member. Except as otherwise provided in this Agreement, no Member in its capacity as such shall have any part in the management or control of the Company nor have the authority or right to act on behalf of the Company in connection with any matter. Each member of the Managing Member may resign at any time by notice to the Managing Member.

**6.2** **Managing Member**. The Company hereby appoints 5M Venture II, LLC (the "***Managing Member***") to provide overall governance to the Company. The Managing Member shall have full authority to bind the Company to all agreements related to its business and the business of its subsidiaries except as provided below in Section 6.3.

**6.3** **Major Decisions**. Notwithstanding anything to the contrary contained in this Agreement, Managing Member shall not cause, permit, or agree without the affirmative written consent of NDR Cox Investments LLC, to:

(a) enter into, modify, terminate, waive (including any failure to enforce rights of the Company or any of its subsidiaries), or amend any material transaction, agreement, or arrangement (including, without limitation, any purchase sale, lease, or exchange of any property or rendering of any service, or the establishment of any salary, other compensation, or other employment arrangement) between the Company or any of its subsidiaries, on the one hand, and any Member or one of its insiders, on the other hand (a "Related Party Transaction");

(b) create, authorize, issue, transfer or grant to any Person (including any Member) any Units, Profits Interest, warrants, options or other equity interests or other interests convertible into or exchangeable for equity interests of the Company or any of its subsidiaries;

(c) incur, guarantee, suffer or assume any indebtedness, or amend, modify, terminate or waive any term of any indebtedness previously approved by the Managing Member, or guarantee any other obligation of any Person other than the Company or one of its subsidiaries, in each case in an aggregate amount in excess of $1,000,000;

(d) make any loan or advance to, or investment in, any business entity or Person (other than the Company's subsidiaries) in any transaction or series of related transactions involving

consideration or having Fair Market Value in excess of (A) $200,000 in any single transaction or series of related transactions or (B) $500,000 in the aggregate within a Fiscal Year;

(e) directly or indirectly redeem, repurchase, purchase or otherwise acquire any Units, warrants, options or other equity interests or other interests convertible into or exchangeable for Units or other equity interests;

(f) transfer, issue, sell, pledge, grant liens on, mortgage, encumber or dispose of any Property owned by the Company or any of its subsidiaries;

(g) authorize or undertake a merger, dissolution, consolidation, restructuring, recapitalization, reorganization or other similar transaction;

(h) file a voluntary bankruptcy petition, allow for the filing of an involuntary bankruptcy petition, make an assignment for the benefit of creditors, voluntarily file a petition seeking a reorganization, liquidation, dissolution or similar relief under any applicable law, propose a compromise or arrangement to its creditors, take any action to have a receiver appointed with respect to any portion of the Company's Property, or otherwise wind up, liquidate or dissolve the Company or any of its subsidiaries;

(i) authorize any initial public offering, direct listing or other public offering of securities of the Company or its subsidiaries;

(j) make any material changes to the business relationships, or otherwise amend, modify, terminate or waive any material provision of any agreement or arrangement with its counterparties;

(k) approve an annual budget of the Company and its subsidiaries or modify or amend any approved budget; <u>provided</u>, <u>however</u>, that in the event that any annual budget is not approved by NDR Cox Investments LLC, the Company's annual budget for the most recent Fiscal Year shall remain in effect subject to a 5% increase (or greater increase proportionate to the Company's and its subsidiaries' respective prior Fiscal Year revenue growth) in operating expenditures and capital expenditures;

(l) enter into, terminate (other than for cause or as permitted by the applicable contract or applicable law), or amend in any respect, any employment contract or other employment arrangement, or promise, grant or agree to increase the compensation or benefits of any (x) officer or (y) employee or consultant earning compensation paid by the Company or one of its subsidiaries, including in respect of base salaries, hourly wages, bonuses (whether pursuant to bonus agreements or discretionary), commissions, profit-sharing arrangements and other incentive compensation arrangements (excluding distributions to the Members) ("Covered Compensation") in an amount greater than or equal to $100,000 per annum, or (B) promise, grant or agree to increase the Covered Compensation paid to any officer, employee, or consultant, in any year if the aggregate amount of Covered Compensation (including the proposed promise, grant or increase) for all officers, employees and consultants of the Company or any of its subsidiaries is in excess of 9% of the gross revenue of the Company and its subsidiaries on a consolidated basis in the immediately preceding twelve (12) month period;

(m) adopt or materially modify any incentive plan or policy, including any equity incentive plan of the Company or any of its subsidiaries;

(n) initiate or settle any litigation, lawsuit, action, dispute, investigation, inquiry, hearing, arbitration or other proceeding with any Person, including any governmental entity, concerning the Company or any of its subsidiaries (other than ordinary course contract disputes, collection matters, and claims litigation covered by insurance policies) with respect to which the amount of the Company's or its subsidiaries' disputed liability exceeds $200,000;

(o) enter into, amend, terminate, waive rights, modify, or amend the terms of any material contract or any other contract or series of related contracts which purportedly binds any Member;

(p) make any material change to the nature of the business conducted by the Company or any of its subsidiaries;

(q) change the U.S. federal income tax classification of the Company or any of its subsidiaries;

(r) make any material change in the underwriting, claims administration, investment, reserving, hedging or risk management, or any other financial accounting guidelines, policies, practices or principles of the Company or any of its subsidiaries, as applicable, other than any change required by the Company's independent accountants;

(s) select, engage or appoint, or terminate the engagement of independent accountants or actuaries; or

(t) make or revoke, or otherwise make any change in, any tax elections or accounting methods or policies, make or approve any allocation of Profits or Losses or any allocation of tax items, or settle any tax audit or administrative or judicial proceeding.

**6.5 Compensation; Use of Agents; Officers.**

(a) Except as set forth elsewhere in this Agreement, the Managing Member shall be entitled to such compensation, if any, from the Company for the performance of its duties as determined by Members holding at least a three-fourths (3/4) majority of Voting Units. Additionally, the members of the Managing Member shall be entitled to reimbursement for normal business expenses that they incur in providing services under this Agreement, provided delivery of appropriate supporting documentation to the Company.

(b) The Managing Member may, from time to time, retain any Person to provide services to the Company. The Managing Member is entitled to rely in good faith upon the recommendations, reports, advice or other services provided by any such Person, which, when retained was reasonably believed by the Managing Member to be qualified to provide such recommendation, reports, advice or other services. The Managing Member may from time to time appoint officers of the Company as it deems necessary, including but not limited to a President and such other officers as the Managing Member deems necessary, and the members of the Managing Member also may serve as an officer of the Company, each of which shall serve for the term designated by the Managing Member or as agreed to by the officer and the Company in a separate written agreement signed by both parties. Exhibit B attached hereto lists the names and titles of the officers as of the Effective Date. None of the officers shall be deemed "***managers***" as that term is used in the Act, but each officer shall be deemed an agent of the Company. Unless otherwise agreed by the officer and the Company in a separate written document signed by both parties, the Managing Member in its sole discretion can remove officers at any time, and an appointed officer,

if any, may resign upon fifteen (15) days prior written notice to the Managing Member. The Managing Member may fill any officer vacancies.

**6.6 Member Consent**. Except as otherwise specifically provided in this Agreement, including but not limited to Sections 3.1(d), 3.2 and 4.1, for any action requiring the consent of the Voting Members under this Agreement or the Act, the Voting Members can act either (i) through a resolution approved by Voting Members holding a majority of the Voting Units or (ii) a written consent signed by those Voting Members, or the requisite percentage of Voting Members, as a single class, needed to approve and authorize such action. A regular meeting of the Voting Members may be scheduled by the Managing Member. The Voting Members may hold their meeting (if applicable) at the principal business office of the Company or such other place as they may agree. Any Voting Member can participate in a meeting by means of a conference telephone or other communications equipment by which all persons participating in the meeting can speak to and hear each other.

**6.7 Accounting and Financial Information; Records**.

(a) Maintenance of Records; Annual Financial Statements. The Company's accounting records shall be maintained at the location where the Company maintains its books and records. The Company shall keep its accounting records and shall report its income for income tax purposes on the method of accounting selected by the accountants normally servicing the books and records of the Company with the approval of the Managing Member. The Company shall use commercially reasonable efforts to obtain an annual audit or review of its financial statements by a qualified independent public accounting firm selected by its Managing Member.

(b) Reports. (i) The Company will deliver to the holders of the Class A Units (A) periodic updates on the Company and the Company Business, (B) quarterly and year-end summary and annual financial statements (which need not be audited), and other information as determined by the Managing Member.

(ii) The Managing Member shall cause to be prepared and timely filed all income and other tax and informational returns of the Company required to be filed with the Internal Revenue Service and any other applicable government authorities. The Company shall use commercially reasonable efforts to cause its tax and informational returns (including IRS Schedule K-1s) by April 1st, of the following year.

**6.8 Duties; Indemnity**.

(a) Notwithstanding anything to the contrary contained in this Agreement, to the fullest extent permitted by applicable law, the parties hereto expressly agree that no Member (including any officer, manager, partner, principal, employee, agent or other Affiliate of any Member), the Managing Member, any member of the Managing Member shall have any duties (including, without limitation, fiduciary duties) to the Company, or any other Person or group of Persons that is a party to, beneficiary of or otherwise bound by this Agreement; provided that the foregoing shall not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.

(b) Subject to Section 6.8(a) hereof, the parties hereto also expressly agree that no Member (including any officer, manager, partner, principal, employee, agent or other Affiliate of any Member), the Managing Member, member of the Managing Member, or officer, employee or agent of the Company or any of its subsidiaries or Affiliates (each hereinafter referred to as an "***Indemnitee***") shall have any liability, responsibility or accountability in damages or otherwise to

any Member, the Managing Member or any member of the Managing Member, or the Company for any debt, obligation, or liability of, or loss suffered by the Company that arises out of any act or omission performed or omitted by such Indemnitee, except to the extent of acts or omissions that constitute fraud, gross negligence, willful misconduct or a knowing violation of law by such Indemnitee. Each Indemnitee shall be indemnified by the Company, and the Company hereby agrees to indemnify, pay, protect and hold harmless the Indemnitee (on the demand of and to the satisfaction of such Indemnitee), to the fullest amount available or permitted under the Act, from and against any and all liabilities, obligations, losses, damages, actions, judgments, suits, proceedings, costs, expenses and disbursements of any kind or nature arising by reason of the fact that such Indemnitee is or was a Member, a member of the Managing Member, or officer, employee or agent of the Company or is or was serving as a manager, officer or other representative of a subsidiary or Affiliate of the Company at the request of the Company except to the extent of acts or omissions that constitute fraud, gross negligence, willful misconduct or a knowing violation of law by such Indemnitee. The foregoing indemnification includes, without limitation, all reasonable legal fees, costs and expenses of defense, appeal and settlement of any and all suits, actions or proceedings instituted against such Indemnitee or the Company and all costs of investigation in connection therewith that may be imposed on, incurred by or asserted against the Indemnitee or the Company in any way relating to or arising out of, or alleged to relate to or arise out of, any action or inaction on the part of the Company, or on the part of the Indemnitee, except to the extent of acts or omissions that constitute fraud, gross negligence, willful misconduct or a knowing violation of law by such Indemnitee. If any action, suit or proceeding shall be pending against the Company or the Indemnitee relating to or arising out of, or alleged to relate to or arise out of, any action or inaction on either of their parts, the Indemnitee shall have the right to employ, at the expense of the Company, separate counsel of its choice in such action, suit or proceeding if and to the extent that a bona fide conflict of interest may exist between or among such Indemnitee and the Company or any other Indemnitee hereunder. The satisfaction of the obligations of the Company under this Section 6.8 shall be from and limited to the assets of the Company, and no Member shall have any personal liability on account thereof.

(c) The Managing Member may grant indemnification rights to any Person involved in any action, suit or proceeding by reason of the fact that he, she or it is or was serving at the request of the Company as a manager, officer, employee or agent of another corporation, partnership, limited liability company, joint venture, trust or other entity, except to the extent of acts or omissions that constitute fraud, gross negligence, willful misconduct or a knowing violation of law by such person.

(d) Any expenses (including attorneys' fees) incurred by any Indemnitee in defending any action, suit or proceeding shall be paid by the Company in advance of the final disposition of such matter if such Indemnitee expressly agrees to repay in full all such amounts if such Indemnitee shall ultimately be determined not to be entitled indemnification under Section 6.8(b) or Section 6.8(c) hereof.

**6.9 New Members**. Except for a Transferee who receives a Unit in a Transfer permitted under Article 7 hereof, a new Member may be admitted only upon the consent of the Managing Member upon the affirmative written consent of NDR Cox Investments LLC. Such new Member shall make such Capital Contribution (if any) and shall receive the Unit(s), and shall otherwise be admitted upon such terms and conditions, as approved by the Managing Member. Admission of a new Member (including a new Member holding a Unit received in a Transfer described in Section 7.1(b) hereof) is conditioned upon the execution of (i) a counterpart copy of this Agreement by such new Member or (ii) a confirmatory document in which such new Member agrees in writing to observe all the terms and conditions of the Agreement, and upon

such admission, the Managing Member shall cause the books and records of the Company to be updated to reflect the ownership interest of the new Member.

**6.10 Rights and Obligations of Members**.

(a) Rights and Obligations of a Member. A Member shall not be personally liable for any of the debts of the Company or any of the losses thereof, whether arising in tort, contract, or otherwise, beyond the Capital Contribution made by such Member to the Company; provided that a Member may be required to repay distributions made to it as provided in the Act. The Members, the Managing Member, members of the Managing Member, and Affiliates of a Member shall not have any personal liability for the repayment of any Capital Contribution of any Member.

(b) Transactions with the Company. A Member or any of its Affiliates, and any member of the Managing Member, may transact other business with the Company, and shall have the same rights and obligations with respect thereto as a person who is not a Member, provided that such transaction is on terms and conditions can be demonstrated to be materially no less favorable to the Company than would be obtained by the Company in a similar transaction with an independent third party, and, provided, further, that the terms and conditions of such transaction could be deemed to be materially less favorable to the Company than would be obtained by the Company in a similar transaction with an independent third party, such transaction shall require the approval or vote of a majority of the Voting Members.

(c) Competitive Activities. Subject to the last sentence of this Section 6.10(c), the Members hereby acknowledge and consent that, subject to provisions of applicable employment agreements or service agreements, a Member, member of the Managing Member, or an Affiliate of any Member or a member of the Managing Member may engage in and possess interests in whatever activities they choose, whether the same are competitive with the Company or otherwise, and any such activities may be undertaken without having or incurring any obligation to offer any interest in such activities to the Company, any Member or any member of the Managing Member or require any Member, member of the Managing Member, to permit the Company, any member of the Managing Member, or Member or their respective Affiliates to participate in any such activities, and as a material part of the consideration for the execution of this Agreement by the Members, each Member (on its own behalf and on behalf of the Company), hereby waives, relinquishes, and renounces any such right or claim of participation.

(d) Confidentiality. Each Member shall keep confidential and not disclose any Company Confidential Information (as defined below) without the express consent of the Company, unless such disclosure shall be required by applicable law, governmental rule or regulation, court order or administrative or arbitration proceeding having jurisdiction over such person. Notwithstanding the foregoing, such Members may disclose Company Confidential Information to: (i) lenders and prospective lenders of such Member or its Affiliates, (ii) parties (actual or prospective) to business combinations with such Member or its Affiliates, and (iii) its Affiliates, managers, officers, partners, employees, attorneys, accountants and advisors of such Member or its Affiliates with a bona fide need to know such information ("***Member Representatives***"); provided, however, that such Member take commercially reasonable precautions (including the requirement that the recipient of such disclosure pursuant to items (i) and (ii) execute a confidentiality agreement containing terms no less restrictive than those set forth in this Section 6.10(d)) to insure that the Company Confidential Information will be kept confidential by the recipient of such disclosure; provided, further, that, without the Company's express prior written consent, such Member shall not disclose any Company Confidential Information that constitute trade secrets (including secret formulas, designs, drawings and other

technical information related to products or services of the Company or any of its direct or indirect subsidiaries) or any confidential information of third parties that any Affiliate is legally obligated to maintain as confidential. "***Company Confidential Information***" means information that is not already available through publicly available sources of information (other than as a result of disclosure by such Member or member of the Managing Member). Company Confidential Information includes, without limitation, information that pertains or relates to (i) the business and affairs of the Company and its subsidiaries, (ii) any investments or proposed investments of the Company, or (iii) any other material Company matters. In the event that any Member, any member of the Managing Member or any of its Member Representatives is required to disclose any of the Company Confidential Information, such Person shall use commercially reasonable efforts to provide the Company with prompt prior written notice so that the Company may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement, and such Person shall use its commercially reasonable efforts to cooperate with the Company in any effort to obtain a protective order or other remedy. In the event that such protective order or other remedy is not obtained, or that the Company waives compliance with the provisions of this Section 6.10(d), such Member, its Member Representatives, any member of the Managing Member will furnish only that portion of the Company Confidential Information that is required and shall exercise their commercially reasonable efforts to obtain reliable assurance that the Company Confidential Information will be accorded confidential treatment.

(e) Representations and Warranties of the Members. Each Member hereby represents and warrants to the Company and the Managing Member as follows: (i) such Member is an "accredited investor" as defined in the 1933 Act, (ii) such Member is a sophisticated investor experienced in private securities transactions and can afford to lose its investment in the Company, (iii) such Member has had the opportunity to ask questions of the Company and the Managing Member and understands the risks inherent to an investment in the Company, and (iv) such Member understands that the Units are illiquid and may be held for an indefinite period of time.

(f) Further Action. Each Member hereby agrees to execute and deliver to the Company within five (5) days after receipt of a written request therefor, such other and further documents and instruments, statements of interest and holdings, designations, powers of attorney and other instruments and to take such other action as all of the Members deem necessary, useful, or appropriate to comply with any laws, rules, or regulations as may be necessary to enable to the Company to fulfill its responsibilities under this Agreement; provided, however, such documents shall neither create greater obligation of the Members nor change their interests in the Company unless such is in accordance with the express terms of this Agreement or the operation of its provisions.

**6.11 Company Representative.**

(a) 5M Venture II, LLC is hereby designated as the "partnership representative" (the "***Company Representative***") as provided in Code Section 6223(a). Any expenses incurred by the Company Representative in carrying out its responsibilities and duties under this Agreement are deemed an operating expense of the Company for which the Company Representative will be reimbursed. Each Member hereby approves of such designation and agrees to execute, certify, acknowledge, deliver, swear to, file, and record at the appropriate public offices such documents as may be deemed necessary or appropriate to evidence such approval, including statements required to be filed with the tax returns of the Company in order to effect the election and designation of the foregoing person as Company Representative.

(b) The Company Representative is authorized to represent the Company in connection with all examinations of the affairs of the Company by any taxing authority, including any resulting administrative and judicial proceedings, and to expend funds of the Company for professional services and costs associated therewith. Each Member agrees to cooperate with the Company Representative and to do or refrain from doing any or all things reasonably requested by the Company Representative with respect to the conduct of examinations by taxing authorities and any resulting proceedings. Each Member agrees that any action taken by the Company Representative in connection with audits of the Company are binding upon such Members and that such Member shall not independently act with respect to tax audits or tax litigation affecting the Company. The Company Representative have sole and absolute discretion to determine whether the Company will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any taxing authority.

(c) In the event of an audit of the Company, the Company Representative, in its sole and absolute discretion, may make any and all elections and take any actions that are available to be made or taken by the Company Representative or the Company under Code (including any election under Code Section 6226). If an election under Code Section 6226(a) is made, the Company shall furnish to each Member for the year under audit a statement of the Member's share of any adjustment set forth in the notice of final partnership adjustment, and each Member shall take such adjustment into account as required under Code Section 6226(b).

(d) Notwithstanding any other provision of this Agreement, the Company shall indemnify and reimburse, to the fullest extent provided by law, the Company Representative for all expenses, including legal and accounting fees (as such fees are incurred), claims, liabilities, losses and damages incurred in connection with any tax audit or judicial review proceeding with respect to the tax liability of the Members or otherwise in connection with the performance of its role as the Company Representative, other than those arising from its gross negligence, willful misconduct or fraud. The payment of all such expenses shall be made before any cash distributions are made to the Members. No Member shall be obligated to provide funds for such purpose.

(e) In the event the Company is liable for any imputed underpayment with respect to items of Company income, gain, loss, deduction or credit that should have been allocated to a Member for the applicable year, such Member shall promptly reimburse the Company for such amount. The foregoing sentence shall apply even if the applicable Member is no longer a member of the Company at the time the Company becomes liable for such imputed underpayment.

(f) Each Member shall give prompt notice to each other Member of any and all notices it receives from the Internal Revenue Service, or any relevant state or local taxing authority, concerning the Company, including any notice of audit, any notice of action with respect to a revenue agent's report, any notice of a 30-day appeal letter and any notice of a deficiency in tax concerning the Company's federal income tax return, or any relevant state or local income tax return. The Company Representative, on behalf of the Company, may settle or compromise audit matters raised by the Internal Revenue Service or any other taxing authority with respect to the Company.

(g) All elections required or permitted to be made by the Company under the Internal Revenue Code or applicable state or local tax law shall be made in the sole discretion of the Company Representative including, without limitation, elections (i) opt out of the Revised Partnership Audit Procedures pursuant to Code Section 6221(b) (in which case, 5M Venture II, LLC shall automatically be designated as the "tax matters partner" (as defined in Code Section 6231 prior to its amendment by the Revised Partnership Audit Procedures), and all of the provisions

of this Section 6.11 shall apply to the tax matters partner as if it were the Company Representative); (ii) to adjust the basis of Company assets pursuant to Code Sections 754, 734(b) and 743(b), or comparable provisions of state or local law, in connection with dispositions of Membership Interests and in connection with distributions; and (iii) to extend the statute of limitations for assessment of tax deficiencies against the Members with respect to adjustments to the Company's federal, state, or local tax returns.

(h) The provisions of this Section 6.11 shall survive the termination of the Company or the termination of any Member's interest in the Company and shall remain binding on the Members for as long a period of time as is necessary to resolve with the Internal Revenue Service any and all matters regarding the federal income taxation of the Company or the Members.

## ARTICLE 7

## TRANSFER OF INTERESTS; PREEMPTIVE RIGHTS

### 7.1 No Transfers.

(a) General and Pledge. Except as otherwise provided in this Article 7, no holder of a Unit may Transfer all or any portion of such Unit other than with the prior written consent of the Managing Member. Any Transfer of a Unit not made in conformance with this Agreement shall be null and void, shall not be recorded on the books of the Company and shall not be recognized by the Company.

(b) Permitted Transfers. Notwithstanding Section 7.1(a) hereof, the following Transfers of all or any portion of a Member's Unit holdings do not require the consent of the Managing Member: Transfers (i) by any Affiliate of a Class A Member of any Units purchased by it in the initial capitalization of the Company hereunder and/or (ii) by a Member to his or her immediate family or a trust or other entity formed for legitimate estate planning or other domestic planning purposes; provided, however, that such Member shall retain and continue to have exclusive voting and other management rights with respect to such Units after any such Transfer to a trust or other entity formed for such purposes.

(c) Right of First Refusal. Notwithstanding anything in this Article 7 to the contrary, except as permitted pursuant to Section 7.1(b) above, with respect to the Transfer of any Units, the Company, first, and the Voting Members on a pro rata basis, second, shall have a right of first refusal to purchase such Units proposed to be Transferred by a Member; provided however that the foregoing right of first refusal provisions shall not apply to any Transfer involving a pledge, hypothecation, or granting a lien or other security interest in any Units so long as the same is approved by a majority of the Voting Members; provided, further any pledge, hypothecation, or granting a lien or other security interest in any Units shall be null and void unless approved by the Managing Member.

**7.2 Securities Law Transfer Restrictions**. All Members acknowledge that the Units have not been registered under the Securities Act of 1933, as amended (the "***1933 Act***"), in reliance on applicable exemptions. Therefore, the Members agree that the Units shall be nontransferable, except in compliance with the 1933 Act and applicable state securities laws, and any attempted Transfer not in compliance shall be void. As an additional condition precedent to the Transfer of any Unit, the Managing Member may require an opinion of counsel satisfactory to the Managing Member that such Transfer will be made in compliance with the 1933 Act and applicable state securities laws, and such transferor shall be responsible for paying any attorneys' fees incurred in connection with the opinion.

**7.3** **Effect of Transfer; Transferees Bound**. A Person shall cease to be a Member, and shall not be entitled to exercise any rights or powers of a Member, upon a Transfer of all of such Person's Unit(s) in the Company. All Transferees shall be required to execute either (i) a joinder to Agreement substantially in the form attached hereto as Exhibit C or (ii) a confirmatory document in which they agree in writing to observe all of the terms and conditions of this Agreement before such Transferee is admitted as a Member (to the extent such Person is not a Member before such Transfer). The Managing Member shall cause the books and records of the Company to be amended to reflect the ownership of Units immediately after the Transfer.

**7.4** **Tag Along and Bring Along Rights**.

(a) Tag Along Rights.

(i) If at any time one or more of the Class A Members (the "***Selling Members***") propose to Transfer thirty percent (30%) or more of the issued and outstanding Class A Units (the "***Offered Units***") in a transaction or series of related transactions other than a permitted transfer under Section 7.1(b) hereof, and such Transfer is approved by the Managing Member, such Member shall give written notice of such proposal to the Company and the Company shall promptly give each Voting Member written notice of such proposed Transfer. Such notice shall include (i) a description of proposed transaction including, without limitation, the number of Units to be sold, (ii) the name(s) and address(es) of the prospective transferee(s), (iii) the consideration (including an estimate, in the Selling Members' good faith judgment, of the fair market value of any non-cash consideration offered by such prospective transferee(s)), and (iv) the material terms and conditions upon which the proposed Transfer is to be made (a "***Co-Sale Notice***").

(ii) Each Voting Member that notifies the Selling Members in writing within thirty (30) days after the date of the Co-Sale Notice (each such Member, together with each Selling Member, a "***Co-Sale Member***") shall have the right to participate in such sale of Offered Units on the same terms and conditions as specified in a Co-Sale Notice. To so participate, the Voting Members shall provide the Selling Members with a notice (an "***Acceptance Notice***") to such effect within thirty (30) days after the date of the Co-Sale Notice, which Acceptance Notice shall also indicate the type and number of Units that such Member wishes to sell.

(iii) To the extent that one or more of the Co-Sale Members exercise such right of participation in accordance with the foregoing terms and conditions, the number of Offered Units that the Selling Members may sell shall be correspondingly reduced in accordance with the next sentence. Each Co-Sale Member may sell a pro rata portion of Units to be purchased based on the aggregate number of Units sought to be sold by such Co-Sale Member by the total number of Units sought to be sold by all of the Co-Sale Members.

(iv) Each Co-Sale Member shall effect its participation in the sale by promptly delivering to the prospective purchaser such documentation as reasonably requested to effect such transaction; provided that each Co-Sale Member's liability therefrom shall be several and proportionate and shall in no circumstance exceed the net proceeds of such sale received by such Co-Sale Member.

(v) To the extent that any other Voting Members have not delivered an Acceptance Notice within thirty (30) days, the Co-Sale Members shall have a period of sixty (60) days thereafter to sell such Units upon terms and conditions (including the purchase price) no more favorable than those specified in the Co-Sale Notice, to the third-party transferee(s) identified in the Co-Sale Notice. Prior to the completion of such a Transfer, the third party transferee(s) shall

have executed documents providing, in a manner reasonably satisfactory to the Company, for such transferee to become a Member and a party to this Agreement. In the event the Selling Members and the Co-Sale Members do not consummate the sale or disposition of such Units within such 60-day period, the first refusal and co-sale rights of the Company and other Members shall continue to be applicable.

(b) Bring Along Rights.

(i) If at any time (x) one or more Voting Members holding at least a majority of the Class A Units then outstanding (the "***Proposing Members***") notify the Company in writing that they propose an acquisition of the Company (a "***Full Sale Transaction***") by another unaffiliated entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger, consolidation, sale of assets or sale of Units) that would result in the transfer of fifty percent (50%) or more of the assets or outstanding Units of the Company or in which the Members immediately prior to such transaction would own, as a result of such transaction, less than a majority of the voting securities of the successor or surviving entity immediately thereafter, and (y) such Full Sale Transaction is approved by the Managing Member and Voting Members holding a majority of the Units voting as a single class, the Company shall promptly give each other Member written notice of such proposed Full Sale Transaction (the "***Full Sale Notice***").

(ii) Each Member hereby agrees that, upon receipt of a Full Sale Notice, with respect to all Units that it own(s) or otherwise exercises voting or dispositive authority, it shall: (u) if the Full Sale Transaction is to be brought to a vote at any Member meeting, after receiving proper notice thereof, be present, in person or by proxy, as a holder of Units and be counted for the purposes of determining the presence of a quorum at such meeting, (v) vote (in person, by proxy or by action by written consent) all Units entitled to vote as to which it has beneficial ownership in favor of such Full Sale Transaction and in opposition of any and all other proposals that could reasonably be expected to delay or impair the consummation of such Full Sale Transaction, (w) refrain from (A) exercising any dissenters' rights or similar rights of appraisal under applicable law at any time with respect to such Full Sale Transaction and (B) taking any action that could reasonably be expected to delay or impair the consummation of such Full Sale Transaction, including, but not limited to, raising any objection to, bringing any litigation against or otherwise contesting such Full Sale Transaction, (x) execute and deliver any and all related documentation and take such other actions to cause the Transfer of his, her or its Units on terms and conditions determined by the Proposing Members and otherwise necessary or desirable to support and consummate the Full Sale Transaction as may reasonably be requested by the Proposing Members; provided that such Member's liability shall in no event exceed the net proceeds received by such Member from the transaction, (y) not deposit any Units beneficially owned by such Member in a voting trust or subject any such Units to any arrangement or agreement with respect to the voting of such Units or which would otherwise impair the transferability of such Units in the Full Sale Transaction and (z) become a party to any agreement approved by the Proposing Members with respect to a Full Sale Transaction (on a pro rata basis) providing for customary and reasonable (on a several and proportionate basis with respect to itself and its ownership of Units) representations and warranties, indemnification obligations (including escrows, hold back or other similar arrangements to support such indemnity obligations), releases or other obligations to which the Proposing Members or their Affiliates (other than the Company or any subsidiary) agree in connection with such Full Sale Transaction (other than any such obligations that relate specifically to a particular Member, such as indemnification with respect to representations and warranties given by a Member regarding such Member's title to and ownership of Units as to which obligations each such Member shall be solely liable); provided that such Member's liability shall in no event

exceed the net proceeds received by such Member from the transaction. Notwithstanding the foregoing, no Member shall be required to take any of the actions set forth in the preceding sentence unless the net proceeds of such Full Sale Transaction are to be distributed to Members consistent with Section 8.2 hereof and the other terms and conditions of the Full Sale Transaction place all Members on a reasonably equivalent basis considering the economic, voting and other differences in type of Units that they own.

(iii) In connection with a Full Sale Transaction, the Members will bear their pro rata share (based upon the number of Units sold) of the costs of any sale of such Units pursuant to the Full Sale Transaction to the extent such costs are incurred for the benefit of all Members and are not otherwise paid by the Company or the acquiring party. For purposes of this Section 7.4(b)(iii), costs incurred in exercising reasonable efforts to take all actions in connection with the consummation of a Full Sale Transaction in accordance with Section 7.4(b)(ii) hereof shall be deemed to be for the benefit of all Members. Costs incurred by Members on their own behalf will not be considered costs of the transaction hereunder.

**7.5 Preemptive Rights.**

(a) Each Member shall have a pro rata right, based on his, her, or its percentage equity ownership in the Company, to participate in subsequent issuances of Units, except: (i) Units issued upon conversion of any Units or as a dividend or distribution on the Units; (ii) Units issued upon the conversion of any debenture, warrant, option or other convertible security; (iii) Units issued upon a unit split, unit dividend or any subdivision of Units; (iv) Units (or options to purchase Units) issued or issuable to officers, employees, advisors, service providers, and consultants of the Company pursuant to any compensation agreement or plan approved by the Managing Member; and (v) Units (or options to purchase Units) issued (or issuable) in consideration for acquisitions to purchase securities or assets of other entities that are approved by the Managing Member.

(b) In the event of any future issuance of equity securities described above, the Company will give written notice to each of the Members of the terms of such issuance. Each Member shall have twenty (20) days to elect, irrevocably and in writing, to participate in such issuance. In the event all such securities are not subscribed for by the Members, the Members who have elected to subscribe shall have the right, pro rata, to exercise their right to subscribe for the remainder of such securities for another twenty (20) day period. After the foregoing election periods the Company shall have the right to issue such securities to third parties on terms no more favorable than those offered to the Members.

## ARTICLE 8

## TERMINATION AND DISSOLUTION

**8.1 Dissolution.** The Company shall be dissolved solely upon the occurrence of any one of the following events (each a "***Dissolution Event***"):

(a) The consent of the Managing Member and a majority of the Voting Members, to dissolve;

(b) The entry of a decree of judicial dissolution pursuant to the Act;

(c) The occurrence of an event that makes it unlawful for all or substantially all of the business of the Company to be continued, but, for this purpose, any cure of illegality within ninety

(90) days after notice of the event to the Company shall be effective retroactively to the date of the event; or

(d) An administrative dissolution of the Company.

**8.2 Dissolution Procedure**.

(a) Winding Up, Liquidation, and Distribution of Assets. Upon dissolution of the Company, unless it is reconstituted and continued, an individual appointed by the Managing Member or, if the Managing Member is unable to so select such an individual, such other representative as designated by the Members holding at least a majority of the Units in the Company (the "***Liquidator***"), shall immediately proceed to wind up the affairs of the Company. As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made, by a recognized firm of certified public accountants, of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution shall occur or the final liquidation shall be completed, as applicable. The Liquidator shall have full power and authority to sell, assign and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and businesslike manner and on such terms and conditions as it deems necessary or advisable, without the consent of the Members. Upon liquidation of the Company, the assets of the Company shall be applied in the following manner and order of priority:

(i) First, to the payment and discharge of all debts and liabilities of the Company to creditors in the order of priority as provided by law, and of the costs and expenses of liquidation;

(ii) Second, to establish such reserves as the Liquidator deems reasonably necessary or advisable, or as required by the Act, to provide for the contingent liabilities of the Company in connection with the liquidation of the Company;

(iii) Third, to the payment and discharge of all debts and liabilities of the Company to the Members who may be creditors in the order of priority as provided by law; and

(iv) Fourth, to the Members in accordance with Section 4.2 hereof.

(b) Complete Distribution. The distribution of cash or Property to a Member in accordance with the provisions of this Section 8.2 shall constitute a complete return to the Member in respect of its Capital Contributions and a complete distribution to the Member of its interest in the Company and the Company's Property.

(c) Deficit Balance in Capital Account. Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Regulations Section 1.704-1(b)(2), no Member nor any of its Affiliates shall have an obligation to make any Capital Contribution for the purposes of eliminating or diminishing any negative Capital Account balance, and such negative Capital Account balance shall not be considered a debt owed by such Member (or its Affiliates) to the Company or to any other person for any purpose whatsoever.

(d) Dissolution Documents.

(i) Upon completion of the winding up, liquidation and distribution of the assets as described in Section 8.2(a) hereof, the Company shall be deemed terminated.

Furthermore, when all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the Company's remaining Property and assets have been distributed to the Members, the certificate of cancellation shall be executed, verified by the persons signing the certificate and filed by the Managing Member, or, if no Managing Member shall then be serving, the Liquidator, with the Delaware Secretary of State. The certificate of cancellation shall be in the form required by the Act. The Managing Member or Liquidator, as the case may be, shall execute and file, in a timely manner, any other documents in any other jurisdictions which may be required in connection with the dissolution of the Company.

(ii) Upon the issuance of the certificate of cancellation, the existence of the Company shall cease, except for any purposes as provided for in the Act.

**8.3** **Return of Contributions**. Except as provided by law, the Act or as specifically set forth in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contributions. If the Company's assets remaining after the payment or discharge of the debts and liabilities of the Company are insufficient to return the Capital Contributions of one or more Members, such Member or Members shall have no recourse against any other Member, any member of the Managing Member, any officer of the Company or any of their Affiliates.

## ARTICLE 9

## GENERAL PROVISIONS

**9.1** **No Third Party Rights**. This Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, the Members and their successors and assignees. This Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under this Agreement or any agreement between the Company and the Members with respect to any Capital Contribution or otherwise.

**9.2** **Notifications**. Except as expressly provided elsewhere in this Agreement, any notice, demand, consent, election, offer, approval, request, or other communication (collectively, a "***Notice***") required or permitted under the Act or this Agreement must be in writing and shall be delivered in person, by facsimile or e-mail with confirmation or by overnight delivery service with receipt, or shall be deposited in the United States Mail, postage prepaid, by certified or registered mail, return receipt requested, to the address shown on the books and records of the Company. Notice to the Company must be addressed to the Company's principal office. Notice shall be deemed received: (i) if by personal delivery, on the date delivered, (ii) if by telecopy or e-mail, on the date confirmed, (iii) if by overnight delivery service, on the date delivered and (iv) if by mail, five (5) days after mailing. Any party may designate, by Notice to all of the others, substitute addresses or addressees for Notices; and, thereafter, Notices are to be directed to those substitute addresses or addressees.

**9.3** **Integration**. This Agreement embodies the entire agreement and understanding among the Members and supersedes all prior agreements and understandings, if any, among and between the Members relating to the subject matter hereof, including without limitation all prior operating agreements of the Company.

**9.4** **Applicable Law. THIS AGREEMENT AND THE RIGHTS OF THE MEMBERS SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO THE CONFLICT OF LAWS RULE THEREOF.**

**9.5** **Counterparts**. This Agreement may be executed in several counterparts and all counterparts so executed shall constitute one Agreement binding on all parties hereto. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**9.6** **Severability**. In case any one or more of the provisions contained in this Agreement or any application thereof, shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and any other application thereof shall not in any way be affected or impaired thereby.

**9.7** **Inurement**. Except otherwise provided in this Agreement, this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, executors, administrators, successors and assigns.

**9.8** **Headings**. Headings are used merely for reference purposes and do not affect content in any manner.

**9.9** **Gender**. Wherever applicable, the pronouns designating the masculine or neuter shall equally apply to the feminine, neuter and masculine genders. Furthermore, wherever applicable within this Agreement, the singular shall include the plural.

**9.10** **Exhibits**. Exhibits, if any, referred to in this Agreement are incorporated by reference into this Agreement.

**9.11** **Waiver of Partition**. All Members specifically waive any direct or indirect rights they now have or may hereafter acquire to cause any assets of the Company now or hereafter acquired to be the subject of a partition suit.

**9.12** **Company Counsel**. The Managing Member may approve on behalf of the Company and the Members any consent to the representation of the Company that counsel may reasonably request pursuant to the applicable rules of professional conduct in any jurisdiction ("***Rules***"). Each Member acknowledges and agrees that the Company Counsel does not represent any Member with respect to the Company in the absence of a clear and explicit agreement to such effect between the Member and the Company Counsel (and that only to the extent specifically set forth in that agreement), and that in the absence of any such agreement the Company Counsel shall owe no duties to any Member with respect to the Company. In the event any dispute or controversy arises between any Member and the Company, then each Member agrees that the Company Counsel may represent the Company in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation. Each Member further acknowledges that, whether or not Company Counsel has in the past represented such Member with respect to other matters, the Company Counsel has not represented the interests of any Member in the preparation and negotiation of this Agreement. Each Member hereby acknowledges and agrees that Company Counsel, in connection with this Agreement and matters pursuant hereto, the organization, management and operation of the Company or any direct or indirect subsidiary, the offering of interests in the Company, or any dispute between the Company and any Member, is acting as counsel to the Company and as such does not represent or owe any duty to any individual Member or to the Members as a group. Each Member hereby waives any conflict created by Company Counsel with respect to the organization, management and operation of the Company, the offering of interests in the Company, or any dispute between the Company and any other Member.

## ARTICLE 10

## AMENDMENTS

Except as otherwise specifically provided for herein, any amendment of this Agreement must be in writing and approved by a majority of the Voting Members voting together as a single class. Notwithstanding the foregoing, the Managing Member shall have the right, on or before the effective date of final regulations, to amend, as determined by the Managing Member in good faith, this Agreement to provide for (i) clarifications and corrections of ambiguities, (ii) the election of a safe harbor under Regulations Section 1.83-3(l) (or any similar provision) under which the fair market value of a Unit that is transferred in connection with the performance of services is treated as being equal to the liquidation value of that interest, (iii) an agreement by the Company and all of its Members to comply with the requirements set forth in such regulations and Internal Revenue Service Notice 2005-43 (and any other guidance provided by the Internal Revenue Service with respect to such election) with respect to all Units transferred in connection with the performance of services while the election remains effective, and (iv) any other amendments reasonably related thereto or reasonably required in connection therewith.

*(Remainder of page intentionally left blank.)*

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

**Class A Members:**

5M Venture II, LLC

By______________________________
Name: MARTIN REITER
Title: AUTHORIZED SIGNER

NDR Cox Investments LLC

By______________________________
Name: Ruben Espinoza
Title: Member.

# EXHIBIT A

## MEMBERS, UNITS AND CAPITAL CONTRIBUTIONS

| **Member Name** | **Address** | **Class A Units Held** | **Capital Contributions Made** |
|---|---|---|---|
| 5M Venture II, LLC | 19 S. LaSalle Street, 16th Floor, Chicago, IL 60603 mark.reiter@5mgroup.com marty.reiter@5mgroup.com | 4,500,000 | |
| NDR Cox Investments LLC | 215 W. Ohio Street, Chicago, IL 60654 ruben@neacbc.com | 5,500,000 | |
| | | | |
| Total: | | 10,000,000 | |
| | | | |
| | | | |

# EXHIBIT B

## LIST OF OFFICERS

| **Name** | **Title** |
| --- | --- |

# EXHIBIT C

## Joinder to Limited Liability Company Agreement

Reference is made to that certain Amended and Restated Limited Liability Company Agreement of Cox Group, LLC, a Delaware limited liability company (the "***Company***"), dated as of December 1, 2023 (as amended, supplemented, or otherwise modified, the "***Agreement***"), by and among those Persons who execute the Agreement from time to time. Except as otherwise indicated, capitalized terms used herein are defined as set forth in the Agreement.

The undersigned, in order to become a Member of the Company, agrees that it hereby becomes a party to the Agreement, subject to all of the restrictions, conditions, and obligations applicable to the Members as set forth in the Agreement.

This Joinder shall take effect and shall become a part of the Agreement immediately upon execution. This Joinder may be executed in counterparts, each of which shall be deemed an original and both of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the undersigned has executed this Joinder as of _______ ___, 202_.

**MEMBER:** ______________________

By: ___________________________
Name: ___________________________
Title: ___________________________

ACCEPTED AND AGREED as of the date set forth above:

**Cox Group, LLC**

**By 5M Venture II, LLC, its Managing Member**

By: ___________________________
Name: ___________________________
Title: ___________________________